Benjamin ROTHBERG, Appellant,

v.

Sanford ROSENBLOOM and Sanford M. Rosenbloom, Executor For the Estate of David Rosenbloom, Deceased.

No. 84–1388.

United States Court of Appeals, Third Circuit.

Argued May 3, 1985.

Decided Sept. 9, 1985.

Rehearing and Rehearing In Banc Denied Oct. 7, 1985.

Stewart Dalzell (argued), Alfred W. Putnam, Jr., Fred Greenberg, Drinker Biddle & Reath, Philadelphia, Pa., for appellant, Benjamin Rothberg.

Tom P. Monteverde (argued), Jean C. Hemphill, Monteverde, Hemphill, Maschmeyer & Obert, Philadelphia, Pa., for appellees, David and Sanford Rosenbloom.

Before GIBBONS and HIGGINBOTHAM, Circuit Judges and SAROKIN, District Judge.*

## OPINION OF THE COURT

GIBBONS, Circuit Judge:

Benjamin Rothberg, the payee of two demand promissory notes, appeals from a judgment in favor of the makers and guarantor. One note, for $441,050, is made by Sanford Rosenbloom and is unconditionally guaranteed by his brother, David Rosenbloom. The other, for $135,000, is made by David Rosenbloom. After a bench trial the district court held that both notes were subject to the defense of *in pari delicto*, because they grew out of transactions involving trading on insider information in violation of the federal securities laws. Rothberg contends that the court erred (1) in finding insider trading violations, and (2) in admitting evidence of other insider trading activities. He also contends that, as a matter of law, the notes in issue were not subject to the *in pari delicto* defense. We affirm in part and remand in part.

## I.

### Insider Trading

Rothberg is a wealthy investor who, with his father, founded Montrose Chemical

Company, a successful business, and who also served as a director of another publicly held company, Mallory Randall Corporation. David Rosenbloom is a self-employed investor who, with others, from 1967 through 1976, acquired control of various publicly held corporations, most notably Nytronics, Inc., where Rosenbloom served as chairman of the executive committee and as director from 1967 through 1973, and Mallory Randall Corporation, where Rosenbloom was a member of the control group, a salaried executive, and a director from 1968 through 1976. Sanford Rosenbloom is a member of the bar who specializes in real estate law. Benson Selzer, a registered representative for a securities broker, served beginning in 1967 as a vice-president and director of Nytronics, Inc., and beginning in 1968 as a vice-president and director of Mallory Randall Corporation.

Six joint ventures were entered into between February of 1968 and May of 1969 for the acquisition of securities in various corporations. In five of these, David and Sanford Rosenbloom were designated as co-venturers. The arrangement involved advances by Rothberg totalling in excess of $1,365,000. Sanford Rosenbloom guaranteed Rothberg against loss, and David Rosenbloom separately guaranteed Sanford's guarantee. Under the terms of the joint venture agreement, the Rosenbloom share of profits was to be shared equally with Benson Selzer, or his father Harry, and the Selzer named in the specific agreement was to share equally with the Rosenblooms the undertaking to indemnify Rothberg against loss.

Three of the first four joint ventures were profitable. The fourth resulted in a loss, for which David Rosenbloom indemnified Rothberg. The last two joint ventures, which give rise to this litigation, also produced losses. These two ventures in-

* Hon. H. Lee Sarokin, United States District Judge for the District of New Jersey, sitting by designation.

volved investments in Mallory Randall Corporation and in Gulton Industries.

## A. The Mallory Randall Joint Venture

Rothberg had been a member of a group of investors led by David Rosenbloom and Benson Selzer which acquired working control of Mallory Randall in 1968. David Rosenbloom became chairman of Mallory Randall's executive committee, a vice-president, treasurer and director. Benson Selzer became a vice-president and a director. Rothberg became a director. On April 18, 1969 Rothberg and Sanford Rosenbloom, a trustee, entered into a joint-venture agreement involving Rothberg's purchase of 10,-800 shares of Mallory Randall stock for approximately $10 a share. Sanford Rosenbloom agreed to indemnify Rothberg, and David Rosenbloom guaranteed Sanford Rosenbloom's indemnity obligation. Henry Selzer, Benson Selzer's father, agreed to indemnify the Rosenblooms for any losses which they might have had to pay to Rothberg, in exchange for 50% of the Rosenblooms' share of any joint venture profit.

About the time of the April 18, 1969 joint venture, Mallory Randall stock, which in December of 1968 had been selling at 15⅝, had declined to a range of 9⅝ to 10½. In December, 1968, Mallory Randall had contracted to purchase a toy manufacturer, Carolina Toy, for a price of 10 times Carolina's 1968 earnings plus additional cash contingent on Carolina's net earnings, up to a maximum purchase price of $21,500,-000. When Carolina's net earnings for 1968 were reported, they were more than double what had been projected, and it became necessary for Mallory Randall to raise 4.2 million additional dollars by a private placement. Mallory Randall made a public announcement of Carolina Toy's 1968 earnings and of the terms of its private placement of bonds, some of which were convertible into common stock.

One week before the April 18, 1969 joint-venture agreement, David Rosenbloom and Benson Selzer learned from the Vice-President of Sales of Carolina Toy that orders for the current year, 1969, substantially exceeded those for the prior year, and that

this was particularly so with respect to Carolina's largest retail customers. David Rosenbloom confirmed the same by looking at certain orders on the books at Carolina Toy and by conversing with Carolina sales people and with certain Carolina customers. No public announcement was made of the anticipated increase in Carolina's 1969 revenues prior to the time the joint venturers bought the 10,800 shares of Mallory Randall stock. During 1969, Mallory Randall's net income increased from $17,787 to $1,620,718; this increase was attributable almost entirely to the earnings of Carolina Toy.

By the end of May, 1969, the Mallory Randall stock price rose to 12⅜. Thereafter, however, because Mallory Randall management was involved with Nytronics, Inc., which experienced a series of reversals after June of 1969, the price declined. As a result of this decline the joint venture lost $107,836.

Rothberg contends that purchase of the 10,800 shares by the April 18, 1969 joint venturers did not involve insider trading in violation of the federal securities laws. His theory is that although David Rosenbloom was an insider, the information which he acquired prior to April 18, 1969 about orders on the books at Carolina Toy was immaterial as a matter of law. The trial court found,

The other tip was that a toy company would have banner earnings for a particular year. That tip was based on inside information which David had a duty not to reveal to the plaintiff. The information was based on his factual inside knowledge of the toy company's activities during the year in question. It was not based upon merely a guess or a prediction.

A reasonable investor in Mallory Randall would consider the information about the 1969 earnings on its Carolina toy subsidiary to be objective, valuable, material knowledge of how much Mallory Randall would earn in the year in question. The only reason the joint venture purchased the Mallory Randall stock

was because of David's tip that the Carolina toy company would have a smashing earnings year.

App. 415. Rothberg urges that this finding of materiality is unsupported by the evidence, in that while David Rosenbloom testified about *orders,* his prediction about *earnings* was only that. To the extent that Rothberg's challenge is to the factual determination of materiality, we reject it. Unquestionably a factfinder could draw the reasonable inference that a reasonable investor would see the obvious connection between increased revenues and the likelihood of increased profits. The finding that a reasonable investor would consider the sales information to be "objective, valuable, material knowledge of how much Mallory Randall would earn in the year in question" is not clearly erroneous. Fed.R.Civ.P. 52(a).

Relying on *S.E.C. v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 851 (2d Cir.1968), *cert. denied,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969), Rothberg urges that he was free to act on his educated guess or prediction as to future Mallory Randall earnings without having to disclose those educated guesses or predictions. The insurmountable difficulty with that argument is that the joint venturers did not act on the basis of a guess or prediction. They acted on the basis of hard information about orders on the books at Carolina Toy. The best proof of the materiality of that information is that the joint venturers, themselves experienced investors, found it to be sufficiently material to form the joint venture and to purchase Mallory Randall stock when it was depressed in price. *Id.* at 851. As the Supreme Court has held,

> What the standard [of materiality] does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of a reasonable shareholder.

*TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). That standard has

been established with respect to the Carolina Toy information.

Thus we hold that the trial court did not err, factually or legally, when it found that the Carolina Toy 1969 sales information was material, and that the insiders should not have used it to the disadvantage of sellers in the market who were unaware of it.

## B. The Gulton Joint Venture

On May 28, 1969, a joint-venture agreement was made between Rothberg and Sanford Rosenbloom, with a guaranty of Sanford's indemnity agreement by David Rosenbloom, and an agreement by Harry Selzer that in exchange for half of the Rosenblooms' profits he would participate in the indemnification of Rothberg. Three weeks before May 28, a public announcement was made that Nytronics had contracted to purchase approximately 20% of the stock of Gulton Industries from Dr. Gulton, its founder, and his family, for $35 a share: $12 million in cash and $10.75 million in secured notes. Nytronics proposed to follow up by submitting an offer to purchase the remaining stock of Gulton solely for securities of Nytronics, but having a value of at least $35 a share.

David Rosenbloom and Benson Selzer were both Nytronics insiders. In their capacity as officers of Nytronics, Rosenbloom and Selzer learned from Dr. Gulton that he believed he controlled the Gulton Board of Directors and would persuade the Board to support a Nytronics proposal for the purchase of the remaining Gulton shares outstanding on a securities-for-securities basis. Because of Nytronics' financial position, the price which Gulton shares, in Nytronics securities, could be expected to command was expected to be very favorable. Dr. Gulton's representation about his supposed ability to control the decision of the Gulton Board was disclosed to Rothberg, and the joint venture agreement followed. Rothberg made the required investment in Gulton stock.

The anticipated joint venture profit never materialized, because, as it turned out, Dr.

Gulton had overestimated his influence on the Gulton Board. Because he had not advised the other members of that Board of his intention to sell his stock to Nytronics before doing so, some Board members opposed, and eventually blocked, the proposed Nytronics-Gulton merger. That left Nytronics with no cash and a minority position in Gulton. As a consequence, the market reacted adversely on both stocks. Nytronics was obliged to sell its Gulton position at a large loss, and Gulton stock declined. The joint venture lost $443,894.50.

The trial court found,

> One tip was [that] a company called Nytronics, of which David Rosenbloom was an officer and director, would make a profitable merger with Gulton. Although there was some publicity about the proposed acquisition of Gulton, the key secret information which David transmitted to the plaintiff was that Dr. Gulton would swing or deliver the votes of the Gulton board to approve the transaction on a stock for stock basis as the Gulton public shareholders, Dr. Gulton having sold his own holdings for cash. David as an insider had a duty to his own corporation not to reveal this key secret to selected persons for the purpose of buying Gulton stock.

>   *   *   *   *   *   *

> The purchases on the basis of such inside information would reinforce the feeling of the Gulton board that there was in fact a strong market for Gulton's shares which would make the merger price unattractive at a time when David's corporation was trying to woo Gulton. Whether or not David breached a duty to Gulton's shareholders, it is sufficient for this purpose that he breached a duty to his own corporation to establish a violation of securities laws under the definitions in [*United States v. Newman*, 664 F.2d 12 (2d Cir.1981) ].

App. 414–15.

Rothberg contends that the district court erred with respect to the Gulton joint venture in two respects. He contends, first, that the information obtained by David Ro-

senbloom from Dr. Gulton was not material, in that when it was obtained the investing public knew, or at least had access to knowledge, that Nytronics proposed to make a securities for securities offer. The district court found, however, that knowledge of Dr. Gulton's expected influence on the Board in favor of the proposed merger would have actual significance in the deliberations of a reasonable shareholder. As with the Mallory Randall transaction, that finding is supported by proof that the joint venture itself acted upon the information.

■ Rothberg's second contention with respect to the Gulton transaction is that because he was an outsider of Gulton, whose stock was traded, as a matter of law he could not have violated Section 10(b). 15 U.S.C. § 78j(b) (1982). In advancing this argument Rothberg relies principally upon *Chiarella v. United States*, 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980), holding that a financial printer who gains information about a proposed transaction does not violate Section 10(b) by trading in the stock of a party to that transaction. *Chiarella* is not apposite, for the printer violated no fiduciary duty to either party to the underlying proposed transaction. In this case David Rosenbloom and Benson Selzer were fiduciaries to Nytronics, a party to the underlying proposed transaction, and owed that corporation a duty not to disclose secret information which would cause others to buy Gulton stock, thereby making it more difficult for Nytronics to consummate a merger on favorable terms. The same contention made by Rothberg in this case was rejected by the court in *United States v. Newman*, 664 F.2d 12, 17 (2d Cir.1981), a criminal prosecution for violation of Section 10(b) by insiders in a tender-offer in the purchase of stock of the target. An insider on either side of a proposed transaction violates the insider trading rule when he uses insider information in violation of the fiduciary duty owed to the corporation to which he owes a duty of confidentiality.

Thus, we hold that the trial court did not err, factually or legally, when it found that the information about Dr. Gulton's supposed influence over the Gulton board was material, and that David Rosenbloom and Benson Selzer were insiders.

## II.

### Evidence of Other Transactions

Rothberg urges that a new trial should be granted because the trial court admitted evidence concerning the four other joint ventures in which the parties engaged, each of which also involved the use, for the advantage of the joint venturers, of insider information. Evidence of other crimes is admissible to show "motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." Fed.R.Evid. 404(b). Intent, knowledge, and absence of mistake were relevant for establishment of the "equal fault" element of the *in pari delicto* defense. It is true that for purposes of the *in pari delicto* defense "a court may look only to conduct associated with the transaction before it, and may not forbid recovery on account of a plaintiff's activities in another setting." *Tarasi v. Pittsburgh National Bank*, 555 F.2d 1152, 1157 (3d Cir.), *cert. denied*, 434 U.S. 965, 98 S.Ct. 504, 54 L.Ed.2d 451 (1977). The trial court did not, however, apply the defense on account of the other transactions, but relied on the other joint ventures as evidence of the nature and purpose of the joint ventures to trade in Mallory Russell and in Gulton stock. For that purpose, the evidence was clearly admissible, and supported the court's finding that Rothberg and the Rosenblooms entered those joint ventures with a knowing purpose of trading on insider information.

## III.

### The *In Pari Delicto* Defense

We now turn at last to the trial court's resolution of the *in pari delicto* defense. At the conclusion of the trial, the judge issued a bench opinion, App. 413–18, in which he concluded that Rosenbloom had indeed communicated "secret information" to Rothberg regarding Dr. Gulton's promise to persuade the Gulton Board to vote for a stock merger. Similarly, Rosenbloom was found to have told Rothberg about the "banner earnings" Carolina Toy expected in 1969. The trial judge considered Rosenbloom to be a knowing "tipper," Rothberg to be a knowing "tippee," and Sanford to be an innocent bystander. App. 413–18. The court concluded,

> The two joint ventures which lost money for which plaintiff seeks to recover in this case were part of what appears to be a plan for investments on speculations between the plaintiff and David Rosenbloom to make profits from David's tips based on inside information. Some of the other joint ventures were indeed very profitable. The conduct of plaintiff in financing these joint ventures to profit secretly on tips from misappropriated inside information is of sufficient magnitude to apply *in pari delicto* under the *Tarasi* case to protect the purposes of the federal law regulating securities transactions for the benefit of investors. The purpose of letting the parties before me stand where the market left them is to deter others from financing ventures to make secret profits from tips of corporate insiders.

App. 415–16. The *"Tarasi* case" to which the district judge refers above is *Tarasi v. Pittsburgh National Bank*, 555 F.2d 1152 (3d Cir.), *cert. denied*, 434 U.S. 965, 98 S.Ct. 504, 54 L.Ed.2d 451 (1977). In *Tarasi* a "tippee" attempted to recover under Section 10(b) for misinformation given by a "tipper." This court, distinguishing *Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968), held that the Section 10(b) suit was barred by the equal wrongdoing of the tippee in making use of the illegal but inaccurate tip. 555 F.2d at 1156–62.

During the pendency of the instant action, however, the vitality of our *Tarasi* rule has been questioned by the United

States Supreme Court in *Bateman Eichler, Hill Richards, Inc. v. Berner,* — U.S. —, 105 S.Ct. 2622, 86 L.Ed.2d 215 (1985). In *Bateman Eichler,* the Supreme Court refused to allow an *in pari delicto* defense to bar "a private damages action under the federal securities laws against corporate insiders and broker-dealers who fraudulently induce investors to purchase the securities by misrepresenting that they are conveying material nonpublic information about the issuer." at —, 105 S.Ct. at 2624. In *Bateman Eichler* the Supreme Court appears to establish a new two-pronged standard for the use of the *in pari delicto* defense, the defense being limited to only two situations:

[A] private action for damages in these circumstances may be barred on the grounds of the plaintiff's own culpability only where (1) as a direct result of its own actions, the plaintiff bears at least substantially equal responsibility for the violations he seeks to redress, and (2) preclusion of suit would not significantly interfere with the effective enforcement of the securities laws and protection of the investing public.

At —, 105 S.Ct. 2629.

Obviously, the district court did not have this passage from the *Bateman Eichler* opinion before it when it made its factual findings and conclusions of law. Accordingly, we feel it appropriate to remand this matter to the trial court to make factual findings as to 1) whether Rothberg bears at least "substantially equal responsibility" for the violations he seeks to redress, and 2) whether preclusion of suit would "significantly interfere" with the effective enforcement of the securities laws and protections of the investing public.

## IV.

### Conclusion

The trial court's findings of fact on the insider trading issue are not clearly erroneous and the insider information utilized by the joint venturers was material as a matter of law. The court did not err in admitting evidence of other similar joint ventures. As to the *in pari delicto* defense, however, the district court's findings of facts were not focused on the subsequently announced test of *Bateman Eichler.* Accordingly, we feel it appropriate to remand this case to the trial court for determination of factual findings under the new standards expressed therein. The judgment, therefore, will be vacated and the case remanded for further proceedings.

A. LEON HIGGINBOTHAM, Jr., Circuit Judge, concurring.

Though I am in complete agreement with the majority's disposition of this case, I write separately to note my reservations regarding their analysis of the Gulton transaction. I agree that the joint venture violated Rule 10b–5 by trading in Gulton stock with the benefit of undisclosed material nonpublic information, but I reach that conclusion by a rather different route.

Under *Chiarella v. United States,* 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980), trading on material nonpublic information does not run afoul of Rule 10b–5 unless the trader violates some specific duty to "disclose or abstain" from using the information in that way. Typically, that duty arises because of the trader's role as a fiduciary of the corporation whose shares are traded. As the majority recognizes, however, that is not the case here. No one involved in the joint venture was a Gulton "insider." Rather, the majority holds that the "breach of duty" element is supplied by the fact that Rosenbloom and Selzer gave their information to the joint venture, in violation of their fiduciary duties as directors of Nytronics, a corporation that was seeking to acquire control of Gulton. Under this theory, it seems to me, there would be no 10b–5 violation had Rosenbloom and Selzer simply used their information on behalf of Nytronics, because then there would have been no breach of their fiduciary duty. Though this would undoubtedly have been more desirable from the point of view of Nytronics' share-

825

holders, I do not see how it would matter to the investing public at large whether it was the joint venture or Nytronics that reaped the benefits of trading on this information. If the investing public is no worse off because the joint venture, rather than Nytronics, traded on material nonpublic information, then for purposes of Rule 10b–5 this is a difference that makes no difference.

I believe the majority is attempting to bring this case within what Professor Loss has called the "misappropriation or breach-of-fiduciary-duty-to-a-third-person theory." L. Loss, *Fundamentals of Securities Regulation* 867 (1983). Under such an approach, which was approved by four justices in *Chiarella*,[1] and left open by the others,[2] one may be liable for trading on nonpublic information if that information was initially entrusted to the trader by a third party for a legitimate purpose and then "misappropriated" by the trader for personal gain. Thus, the possibility was left open that Chiarella, who was entrusted by his clients with nonpublic information regarding planned tender offers in his capacity as a printer of financial documents, could be liable under 10b–5 for using that information to his personal advantage in securities transactions. Similarly, in *United States v. Newman*, 664 F.2d 12 (2d Cir.1981), *cert. denied,* —— U.S. ——, 104 S.Ct. 193, 78 L.Ed.2d 170 (1983)—upon which the majority relies—employees of an investment banking firm were, in the course of their duties, privy to information regarding their client's tender offer plans. They were held to be liable under 10b–5 for misappropriating that information for their personal gain.

In *Newman* and *Chiarella* the traders, arguably, violated an "insider's" duty of confidentiality—albeit a duty owed to a corporation seeking to buy shares on the market rather than (as in the usual case) a corporation whose shares are to be sold.

Here, however, the traders did not receive their information from the acquiring corporation, Nytronics, in the course of their duties as officers. Rather, the fact that Nytronics wished to acquire Gulton was publicly known, and Rosenbloom and Selzer were simply recipients of a strategic leak of information from an insider of the target corporation. Thus, I think the misappropriation theory is not apposite here, and it is by attempting to force this case into that particular mold that the majority reaches the anomalous result, noted above, that 10b–5 liability hinges on whether the joint venture or Nytronics used the information.

I believe that, in either circumstance, the investing public that lacks this information is being mulcted. We must, therefore, look elsewhere for a theoretical basis for 10b–5 liability. In certain circumstances, the Supreme Court has held, one who receives nonpublic information from a corporate insider—a "tippee"—also acquires a duty to disclose or abstain that "is derivative from that of the insider's duty." *Dirks v. SEC*, 463 U.S. 646, 659, 103 S.Ct. 3255, 3263, 77 L.Ed.2d 911 (1983). As the Court stated:

> The need for a ban on some tippee trading is clear. Not only are insiders forbidden by their fiduciary relationship from personally using undisclosed corporate information to their advantage, but they also may not give such information to an outsider for the same improper purpose of exploiting the information for their personal gain.... [A] contrary rule "would open up opportunities for devious dealings in the name of others that the trustee could not conduct in his own."

463 U.S. at 659, 103 S.Ct. at 3263–64 (quoting *Mosser v. Darrow*, 341 U.S. 267, 271, 71 S.Ct. 680, 682, 95 L.Ed. 927 (1951)).

Rosenbloom and Selzer were tippees; they received their information from a corporate insider, Dr. Gulton, who could not

1. *See* 445 U.S. at 238–39, 100 S.Ct. at 1119–20 (Brennan, J., concurring in the judgment), 445 U.S. at 239–243, 100 S.Ct. at 1120–1122 (Burger, C.J., dissenting), 445 U.S. at 245–46, 100 S.Ct. at 1123–24 (Blackmun, Marshall, JJ., dissenting).

2. *See* 445 U.S. at 235–36, 100 S.Ct. at 1118–19 (majority opinion). 445 U.S. at 237–38, 100 S.Ct. at 1119–20 (Stevens, J., concurring).

have traded on this information himself without disclosing it. Thus, the question remaining is whether, under criteria announced in *Dirks*, Rosenbloom and Selzer also acquired Dr. Gulton's duty to abstain or disclose:

[A] tippee assumes a fiduciary duty to the shareholders of a corporation not to trade on material nonpublic information only when the insider has breached his fiduciary duty to the shareholders by disclosing the information to the tippee and the tippee knows or should know that there has been a breach.

*Dirks*, 463 U.S. at 660, 103 S.Ct. at 3264. The test as to whether a disclosure by an insider amounts to a breach of fiduciary duty focuses on "objective criteria, *i.e.,* whether the insider receives a direct or indirect personal benefit from the disclosure." 463 U.S. at 663, 103 S.Ct. at 3265. "For example, there may be a relationship between the insider and the recipient that suggests a *quid pro quo* from the latter, or an intention to benefit the particular recipient." 463 U.S. at 664, 103 S.Ct. at 3266.

Under these objective tests, there can be no question but that Dr. Gulton breached his fiduciary duty by tipping off Rosenbloom and Selzer. By giving officers of Nytronics information regarding the intentions of the Gulton board, he almost certainly facilitated the sale of his own shares, because without confidence that it would obtain control of Gulton, Nytronics would have had little interest in Dr. Gulton's shares. Indeed, it appears that the Gulton board may have backed away from the deal out of resentment over Dr. Gulton's self-dealing, and when the deal fell through the price of the shares Nytronics had already purchased fell sharply. Moreover, all of this would have been apparent to any reasonable person in the position of Rosenbloom and Selzer. Therefore, I would hold that they violated 10b–5 on the theory announced in *Dirks*. This result in no way depends on who was the ultimate beneficiary of the tip.