### SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

### Harold Fitzgerald LENFEST and Marguerite Lenfest, Defendants.

No. 95–CV–7597.

United States District Court,
E.D. Pennsylvania.

Dec. 23, 1996.

Linda Chatman Thomsen, Sara D. Lipscomb, Securities & Exchange Comm., Washington, DC, Michael J. Newman, Securities & Exchange Comm., Philadelphia, PA, for Plaintiff.

Alexander Kerr, Hoyle, Morris & Kerr, Philadelphia, PA, Richard J. Morvillo, Luther Zeigler, Jeffrey F. Robertson, Crowell & Moring L.L.P., Washington, DC, New York City, for Defendants.

### *MEMORANDUM AND ORDER*

JOYNER, District Judge.

The Securities and Exchange Commission ("SEC") has brought this federal question action against Defendants H.F. and Marguerite Lenfest for alleged violations of Section 10(b) of the Securities and Exchange Act of 1934, (the "1934 Act"), as codified at 15 U.S.C. § 78j (West 1992), and Rule 10b–5 promulgated thereunder. Defendant Marguerite Lenfest has filed this summary judgment motion pursuant to Fed.R.Civ.P. 56(c), claiming that she is not an insider of the company whose stock she allegedly traded and therefore cannot be held liable under Section 10(b). We disagree with defendant's contention and accordingly, we deny summary judgment.

### BACKGROUND

Defendant H.F. Lenfest is the Founder, President and Chief Executive Officer of Lenfest Communications Inc. ("LCI"), a cable television business that is estimated to be the 20th largest cable business in the United

States. His wife, Defendant Marguerite Lenfest, is also an officer of LCI. Together with a third party, the Lenfests have constituted the Board of Directors of LCI since 1981.

During the periods at issue in this lawsuit, LCI was owned 50% by various members of the Lenfest family, and 50% by Liberty Media Corporation ("Liberty"), another cable business for which Mr. Lenfest serves on the Board of Directors. Liberty received its interest in LCI from Tele–Communications, Inc. ("TCI"), a third cable related business.

On October 6, 1993, Mr. Lenfest, by virtue of his position as a member of Liberty's Board of Directors, became aware of an impending merger between Liberty and TCI that would then result in the combined entity's merger with Bell Atlantic Corporation ("Bell Atlantic"). Mr. Lenfest, and all others at the Liberty Board of Directors' meeting, were cautioned not to trade in any of the three affected companies.

The following day, there were press reports of the possible TCI/Liberty merger but Mr. Lenfest did not confirm or deny them despite inquiries from employees of LCI. Nevertheless, he did reveal this nonpublic highly confidential information to his wife while on a trip later that day. He also told her about the possible merger with Bell Atlantic describing it as the "largest merger in history." By October 8th, there was a press release announcing the imminence of the TCI/Liberty transaction and for the next three or four days, there was also publicity about the possibility of a major telephone company investing in the TCI/Liberty merger, references most likely to Bell Atlantic.

On October 10, 1993 Mrs. Lenfest asked her son, Chase Lenfest to purchase either Liberty or TCI stock for one of her investment accounts, for which he was manager. Chase Lenfest then asked his father which stock, Liberty or TCI, he thought would make a better purchase. Mr. Lenfest replied that he thought that TCI would make the better purchase and Chase Lenfest subsequently purchased TCI stock for himself and his mother.[1] Two days later, the proposed TCI/Liberty/Bell Atlantic merger was publicly announced.

In support of her summary judgment motion, defendant's central argument is that Mrs. Lenfest cannot be held liable for insider trading because she was not an insider of either Liberty or TCI.[2] We reject defendant's argument and hold that defendant may nevertheless be held liable for violations of Section 10b.

## DISCUSSION

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) authorizes the court to grant summary judgment if there is no genuine issue of material fact. In deciding a summary judgment mo-

---

1. Chase Lenfest is not being charged in this action for his part in any of the transactions described in this memorandum.

2. Defendant also contends that the publicity surrounding the proposed TCI/Liberty merger makes it difficult to argue that the purchase of TCI stock was based on inside information, and that the market had allegedly realigned the relative prices of TCI and Liberty to reflect the publicity about the TCI/Liberty merger. Second, defendant contends that Mr. Lenfest did not reveal the information intending his wife to trade in the prohibited stock and indeed, that she did not do so. Rather, Mrs. Lenfest merely reminded her son to purchase stock for her that he was to have purchased long before the merger news was even known to her husband. Indeed, Mrs. Lenfest claims that she does not remember her husband telling her about the possible mergers, and she does not even remember her son asking her husband for his advice as to whether he should purchase TCI or Liberty stock. Third, Mr. Lenfest claims that he was unaware that his son had intended to purchase stock for his mother when he asked the question, and Chase Lenfest claims that he asked his father the question merely intending to engage him in conversation; he had always intended to purchase TCI stock anyway. In fact, defendants further argue, given the impending merger between the two companies, it really does not matter whether TCI or Liberty stock was purchased and so Mr. Lenfest's response did not disclose anything to his son.

We note that defendant's first argument concerns whether the merger news was material given the surrounding publicity, but defendant has not given us information on the amount or exact nature of the publicity. Furthermore, it seems that in any event, Chase Lenfest traded before the merger news was officially and publicly announced. Finally, defendant has also conceded that its second and third arguments are factual issues for the jury's resolution.

tion, the court is constrained to draw all reasonable inferences in favor of the non-moving party. *Gans v. Mundy*, 762 F.2d 338, 340 (3d Cir.1985). If a reasonable jury could find in favor of the non-moving party, summary judgment will not be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Rather, the summary judgment standard requires the moving party to show that the case is so one-sided that it should prevail as a matter of law. *Id.* at 252, 106 S.Ct. at 2512. Nevertheless, the non-moving party must raise more than a scintilla of evidence in order to overcome a summary judgment motion. *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir.1989), Further, the non-moving party cannot survive a summary judgment motion by relying on unsupported assertions. *Id.* We shall apply this standard to the claims below.

### B. Section 10b

Section 10(b) of the 1934 Act prohibits the use, "in connection with the purchase or sale of any security ..., [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b) (West 1992). Rule 10b–5 provides in relevant part,

> it shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> . . . .
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5 (1996). This rule has primarily been used to prevent what is commonly called insider trading.

### 1. The Classic Theory

The classic theory of insider trading involves an insider of a corporation, or one who receives material nonpublic information in violation of the insider's fiduciary duty to the corporation, who then trades in the securities of said corporation. *Chiarella v. U.S.*, 445 U.S. 222, 230, 100 S.Ct. 1108, 1115–16, 63 L.Ed.2d 348 (1980). Since the information is highly confidential and unknown to the general public, the party trading in the securities is able to buy or sell the securities before the rest of the market becomes aware of the information, and before that knowledge has affected the price of the security. The result is that the trader makes a significant profit by acting before others in the market have also had an opportunity to learn of the information and act upon it.

The insider who has breached a fiduciary duty to the shareholders of the corporation, is clearly liable for that breach. In addition, the person who receives the material information, the tippee, also inherits the insider's duty not to trade, and therefore the tippee can also be held liable for trading. *Dirks v. S.E.C.*, 463 U.S. 646, 660–661, 103 S.Ct. 3255, 3264–65, 77 L.Ed.2d 911 (1983).

### 2. The Misappropriation Theory

Under the misappropriation theory, however, the person who trades on material nonpublic information need not be an insider or receive the information from an insider in order to be held liable for violations of Section 10b. The Seventh Circuit has expressed the misappropriation theory by stating that as long as the person trading received the information due to a breach of a fiduciary duty owed to any lawful possessor of material nonpublic information, the trader can be held liable under Section 10b and Rule 10b–5. *S.E.C. v. Cherif*, 933 F.2d 403, 409 (7th Cir. 1991). The Ninth Circuit has expressed the theory in slightly different terms, and has stated that the theory only requires (1) the misappropriation of material information (2) through a breach of a duty of trust and confidence, (3) and the use of the information in a securities transaction. There is no requirement that the person owe a duty to the shareholders of the stock. *S.E.C. v. Clark,*

915 F.2d 439, 443 (9th Cir.1990). The significance of the Ninth Circuit formulation is that the use of the information need not arise from the breach of a fiduciary duty, only a relationship of trust or confidence is necessary.

In any event, the Supreme Court has declined to assess the viability of the misappropriation theory, *see Chiarella,* 445 U.S. at 234, 100 S.Ct. at 1117–18, and circuits have differed as to whether it should be accepted. The Third Circuit has not squarely addressed the theory, and to our knowledge, neither have any courts in this district. Nevertheless, after carefully analyzing the *Chiarella* decision, reviewing the rationale of the various circuits, and considering the only Third Circuit case that even comes close to mentioning the misappropriation theory, we agree with the reasoning employed by those courts that have adopted the theory.

The Supreme Court had occasion to consider the misappropriation theory in *Chiarella,* a criminal case concerning an employee of a New York printing firm who received material nonpublic information by virtue of his employment. The defendant used this information to trade in securities of a corporation and made significant profits. The trial court had charged the jury that the defendant owed a duty to the general public since he knew that not everyone was privy to the information. Defendant was then convicted. The Supreme Court overturned the defendant's conviction holding that there was no general duty to disclose under section 10b, merely because defendant had had material information to which others in the market had not been privy. *Chiarella,* 445 U.S. at 230, 100 S.Ct. at 1115–16. The government hinted at the possibility that the defendant could be liable for the trading by reasoning that he had breached his duty to his employer to keep the information confidential, but since the theory had not been presented to the jury, the Supreme Court did not discuss it.[3] This theory eventually became known as the misappropriation theory.

The Third Circuit has also had occasion to consider the misappropriation theory. In *Rothberg v. Rosenbloom,* 771 F.2d 818 (3d Cir.1985), *rev'd on other grounds,* 808 F.2d 252 (3d Cir.1986), a public announcement was made that a company called Nytronics was planning to buy 20% of the stock of another company called Gulton Industries. Rosenbloom, a Nytronics insider, learned from Dr. Gulton, one of Gulton Industries' directors, that Dr. Gulton believed that he controlled the Gulton Board and could persuade it to purchase even more of Nytronics stock than had been announced would be purchased. Rosenbloom told Rothberg this information and Rothberg invested in Gulton stock in accordance with a joint venture agreement between Rothberg and Rosenbloom. It later turned out that Dr. Gulton did not have as much control over the Gulton Board as he had thought. The Board voted not to buy

---

**3.** Subsequently, in *Dirks v. S.E.C.,* 463 U.S. 646, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983), the Supreme Court, while not directly addressing the misappropriation theory, used language that the Lenfests argue would evidence a reading of the securities laws that is inconsistent with support for the misappropriation theory. *Dirks* involved an employee of a broker dealer firm who received material nonpublic information from a former officer of a corporation. This information would tend to show that the corporation was overstating its assets and the former officer encouraged Dirks to investigate the allegations. In the course of doing so, Dirks freely disclosed the information to a number of people, some of whom traded based on the information. The Supreme Court stated that to be held liable for trading, the person must be the corporation's agent, fiduciary or one in whom the sellers of the securities would have placed their trust or confidence. *Id.* at 655, 103 S.Ct. at 3261–62. Defendants argue that Mrs. Lenfest does not fit in any

of these categories. Nevertheless, we note *Dirks* dealt with tippee liability, which is not charged here. *See also U.S. v. Reed,* 601 F.Supp 685, 697–99 (S.D.N.Y.1985) (*Dirks* case dealt with tippee liability and does not affect viability of misappropriation theory).

In addition, the Supreme Court declined to address the misappropriation theory in *Carpenter v. U.S.,* 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987). *Carpenter* involved a reporter for the Wall Street Journal who was convicted, under section 10b of the 1934 Act and under mail and wire fraud statutes, for trading by using confidential information from Wall Street Journal editions that had not yet been released for sale to the public. The Supreme Court devoted its opinion to the mail and wire fraud charges against the defendants, and simply stated in one sentence that it was divided as to the convictions under the securities laws, and therefore would affirm the convictions. *Id.* at 24, 108 S.Ct. at 319–20.

Nytronics stock and the joint venture failed. Rothberg then brought a suit against Rosenbloom for the funds he lost. The Third Circuit stated, without even mentioning the misappropriation theory, that Rosenbloom, as a fiduciary to Nytronics, owed it a duty not to disclose information that would cause others to buy Gulton stock, thereby making it difficult for Nytronics to merge with Gulton. *Rothberg,* 771 F.2d at 822. The court then cited *U.S. v. Newman,* 664 F.2d 12 (2d Cir.1981), a case that had applied the misappropriation theory, and stated that "an insider on either side of a proposed transaction violates the insider trading rule when he uses insider information in violation of the fiduciary duty owed to the corporation to which he owes a duty of confidentiality." *Rothberg,* 771 F.2d at 822. It therefore seems as if the Third Circuit was applying the misappropriation theory, *see also id.* at 824 (Higginbotham, J., concurring) (majority incorrectly attempts to use misappropriation theory), but it is not clear whether they in fact did so or not.

The misappropriation theory has also been adopted by the Second, Seventh and Ninth Circuits and applied in a variety of contexts. *See e.g., Newman,* 664 F.2d 12 (2d Cir.1981) (employees of investment banking firm used nonpublic material information received during the course of employment to trade in securities of companies about which they had received the information), *Cherif,* 933 F.2d at 410 (employee used identification card to gain access to former employer's premises and gain confidential information about impending tender offers) and *Clark,* 915 F.2d 439 (employee held liable for trading in stock of company his employer's parent company intended to acquire).

Particularly interesting for our purposes is the application of the misappropriation theory by the Southern District of New York in *U.S. v. Reed,* 601 F.Supp 685 (S.D.N.Y.1985), *rev'd on other grounds,* 773 F.2d 477 (2d Cir.1985). In strikingly similar facts to this case, *Reed* involved a father who, as an insider to a corporation that was on the brink of a merger, disclosed the information to his son in confidence. His son used the information in disregard of their confidential relationship and traded. *Reed,* 601 F.Supp at 703–18. The court applied the misappropriation theory to hold the son liable for trading. While cautioning that the mere existence of a family relationship does not mean that there is a relationship of trust or confidence, the *Reed* court nonetheless was able to conclude that allegations of a confidential relationship between the father and son was enough to bring the case within the misappropriation theory and withstand a motion to dismiss. *Id.* at 717.[4]

### C. Analysis

■ Applying the principles delineated above to the instant case, we note that Mrs. Lenfest could arguably be said to have misappropriated information from her husband and used it to her benefit. Her husband clearly has a fiduciary duty to the shareholders of Liberty as a member of its Board of Directors and the information that Mrs. Lenfest received was clearly inside information. Furthermore, Mr. Lenfest has admitted in his affidavit that he has a confidential relationship which includes sharing such important information with his wife and indeed, he states that she has always maintained his trust, perhaps until now.

Nevertheless, the defendants argue that since Mrs. Lenfest did not trade in Liberty

---

4. In *U.S. v. Chestman,* 947 F.2d 551 (2d Cir. 1991) the Second Circuit dealt with a case very similar to *Reed* but the court nevertheless expressly declined to overrule *Reed. Chestman,* 947 F.2d at 569. Robert Chestman was a dealer who received information from Keith Loeb, the husband of Susan Loeb, a member of the Waldbaum family. Through his wife, Keith Loeb found out about the impending sale of the Waldbaum family company to another company. Keith Loeb passed this information on to Chestman and the two bought significant amounts of Waldbaum stock. The government sought to prosecute Loeb using the misappropriation theory. The Second Circuit distinguished *Reed* by noting that there had been insufficient proof that the Loebs had had a sharing relationship of trust and confidence similar to the one described by the court in *Reed.* It is therefore unclear whether the Second Circuit would follow *Reed* if an appropriate case came before it. Nevertheless, we are persuaded by the analysis in *Reed* and choose to follow it.

346

stock but instead traded in TCI stock, and that since TCI was not a company to which Mr. Lenfest had a fiduciary duty, Mrs. Lenfest could not be said to have misappropriated information that was given in violation of his fiduciary duty. Defendants have obviously confused the discussion in *Dirks,* which concerned tippee liability and not the misappropriation theory, with the issues presented here. *Dirks* involved the classic theory of insider trading, and unlike the misappropriation cases, required that the sellers have at least placed their trust and confidence in the trader. In contrast, the broad formulation of the misappropriation theory as expressed by the Ninth Circuit in *Clark,* and which we have adopted and delineated earlier, merely requires a showing that the information was misappropriated in violation of a duty of trust or confidence. *See also Reed,* 601 F.Supp at 699 (*Dirks* rationale on tippee theory of liability does not inform misappropriation analysis). While it is true that if Mrs. Lenfest had traded in Liberty stock the facts of this case would have brought us squarely within the parameters of *Reed,* we note that nothing in the *Reed* opinion causes us to believe that the court would not have allowed Mr. Reed to be held liable if he had traded in the stock of the other company to the merger, that is, the company for which his father was not a fiduciary. Indeed the court in *Reed* stated that "it does not matter for purposes of assessing liability whether the recipient of the information is actually trading in the securities issued by the source of the information." *Id.* at 700. Furthermore, Mrs. Lenfest told her son to trade in either TCI or Liberty. To say that if Chase Lenfest had bought Liberty stock Mrs. Lenfest would be liable, but that since he fortuitously bought TCI stock she is not liable, even though both companies were on the brink of merger, is to exhort form over substance. Either way, Mrs. Lenfest could be found by a jury to have decided to use the material information she received from her husband to her benefit. Accordingly, we hold the misappropriation theory could support extending liability for Mrs. Lenfest's actions and summary judgment is denied.

An Appropriate Order follows.

*ORDER*

AND NOW, this 23rd day of December, 1996, upon consideration of Defendant Marguerite Lenfest's Summary Judgment Motion, and the responses thereto, Defendant's motion is hereby DENIED.