**Benjamin ROTHBERG, Appellant,**

**v.**

**Sanford ROSENBLOOM and Sanford Rosenbloom as Executor of the Estate of David B. Rosenbloom, Deceased, Appellees.**

**No. 86–1120.**

United States Court of Appeals, Third Circuit.

Argued Sept. 18, 1986.

Decided Dec. 29, 1986.

Rehearing and Rehearing In Banc Denied Jan. 27, 1987.

Stewart Dalzell (argued), Alfred W. Putnam, Jr., Drinker, Biddle & Reath, Philadelphia, Pa., for appellant.

Tom P. Monteverde (argued), Jean C. Hemphill, Monteverde, Hemphill, Maschmeyer & Obert, Philadelphia, Pa., for appellees.

Before SEITZ, SLOVITER, and ROSENN, Circuit Judges.

**JUDGMENT OF THE COURT**

ROSENN, Circuit Judge.

Plaintiff Benjamin Rothberg sought payment in this diversity action on two promis-

sory notes, each executed by one of the defendants. The defendant David Rosenbloom guaranteed the note executed by defendant Sanford Rosenbloom, and all instruments were dated February 7, 1979. In answers filed by each of the defendants, they made no challenge to the validity of the notes and the guarantee, but asserted that the notes arose out of obligations created by agreements between the parties in 1969 to engage in transactions prohibited by section 10(b) of the Securities Exchange Act of 1934 as amended and Rule 10(b)–5 of the Securities Exchange Commission promulgated thereunder.

After a bench trial, the district court found that the promissory notes had their genesis in two of several joint ventures formed by the parties some ten years before for the purpose of trading on insider information contrary to law. It therefore denied Rothberg relief on an *in pari delicto* theory, relying on this court's decision in *Tarasi v. Pittsburgh National Bank,* 555 F.2d 1152 (3d Cir.), *cert. denied,* 434 U.S. 965, 98 S.Ct. 504, 54 L.Ed.2d 451 (1977).

Rothberg appealed to this court, contending that *Tarasi* did not control because the suit was brought on the notes only, not for redress of a securities laws violation. Before a decision was rendered on that appeal, the Supreme Court overruled *Tarasi* in *Bateman Eichler, Hill Richards, Inc. v. Berner,* 472 U.S. 299, 86 L.Ed.2d 215, 105 S.Ct. 2622 (1985), which rejected the general availability of the *in pari delicto* defense to tippers of securities information sued by their tippees. This court therefore remanded Rothberg's suit for reconsideration of the *in pari delicto* defense in light of *Bateman Eichler. Rothberg v. Rosenbloom,* 771 F.2d 818 (3d Cir.1985).

On remand, the district court, on the basis of the original record, held that although *Bateman Eichler* bars the *in pari delicto* defense in most suits by tippees against their tippers, this case fell within an exception set forth in that opinion, and

that the *in pari delicto* defense was therefore available to the Rosenblooms. Furthermore, the court held that Pennsylvania law did not bar a separate defense of illegality, specifically disclaimed by the Rosenblooms, because enforcement of the notes would offend public policy. Accordingly, the court again entered judgment for the defendants. 628 F.Supp. 746. Rothberg appeals this judgment. We reverse.

### I.

A brief description of the cast of characters in the scenario before us is helpful. Plaintiff Benjamin Rothberg is a chemist and cofounder of Montrose Chemical Company. He also served as a director of the publicly held Mallory Randall Corporation for one year.[1] David Rosenbloom, an officer and director of several corporations prior to his death, served as chairman of the executive committee and a director of Nytronics, Inc., a publicly held corporation, from 1967 through 1973. He also was a member of the control group, a salaried executive, and a director of Mallory Randall from 1968 through 1976. A graduate of the Wharton School of the University of Pennsylvania, David had twice attended but never completed law school. His brother, Sanford, is a practicing lawyer since 1955, specializing in real estate. Benson Selzer, not a party here, is a registered representative for a New York securities brokerage firm. A close friend and business associate of David, Selzer was part of the group (including David) which acquired control of Nytronics. He served as a vice-president and director of both Nytronics and Mallory Randall. Rothberg and David met when a corporation controlled by David, Centlivre Brewing Co., merged with Montrose Chemical. David introduced Rothberg to Selzer, who subsequently became Rothberg's stock broker.

In 1968 and 1969, Rothberg entered into six "joint ventures" with either Sanford or David. All but the first of these joint

---

**1.** Rothberg had apparently stepped down from the board of Mallory Randall prior to his pur-

chase as a joint venturer of its securities.

ventures were formed to trade on inside information available to David or Selzer as officers or directors. Rothberg, not an insider, advanced about $1,365,000 for these joint ventures, with the co-venturer (either David or Sanford) contributing only $100 each time. Under the agreements, the co-venturer had the power to sell the securities involved. If the investments were profitable, all profits were to be shared equally. If the investments lost money, however, Sanford was to indemnify Rothberg for any losses. David executed a separate guaranty for this indemnification agreement.

The first three ventures yielded profits, which were shared according to the agreement. The fourth resulted in a loss, for which the Rosenblooms accordingly indemnified Rothberg. The last two ventures, involving investments in Mallory Randall Corporation and Gulton Industries, also resulted in losses. This time, the Rosenblooms did not reimburse Rothberg.

In 1972 Rothberg agreed to extend the joint ventures and not to sue for indemnification. In return for this forbearance, Sanford gave him a demand note, guaranteed by David. In a contemporaneous letter, prepared by David, the Rosenblooms waived any defenses, counterclaims, or set-offs to the note. In 1979, the Rosenblooms, still not having paid the note, entered into an arrangement with Rothberg to give him two new notes for a liquidated

sum at a reduced rate of interest, and Rothberg agreed not to sue on the earlier note. Rothberg's suit on these notes and the guarantee are the subjects of this appeal.

## II.

On appeal, Rothberg argues first that the district court erred in allowing an *in pari delicto* defense, because that defense is unavailable to the defendants under the general rule of *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 105 S.Ct. 2622, 86 L.Ed.2d 215 (1985), and because the exception to that rule does not apply here. Second, he asserts that the trial court erred in holding that under Pennsylvania law the notes were unenforceable because they were related to a transaction illegal under federal law and offended public policy.[2]

The *in pari delicto* defense is related to the illegality defense in its goal of deterring wrongdoing and its policy of denying judicial relief to wrongdoers. Prior to the Supreme Court's decision in *Bateman Eichler, Hill Richards, Inc. v. Berner, supra,* the circuits had disagreed whether the *in pari delicto* defense was available to tippers in securities litigation.[3] Some courts held that the defense's inconsistency with effective enforcement of the insider trading prohibitions of the securities acts outweighed its usefulness in tipper-tippee

---

**2.** The district court addressed the defense of illegality under Pennsylvania law and concluded that it supplied an alternative basis for denying relief. The court held as a matter of law that the notes would not be enforced because the underlying transactions upon which they were predicated offended public policy as being "part of a plan between Rothberg and David to violate federal securities laws." 628 F.Supp. at 755.

We see no need to consider the defense of illegality under Pennsylvania law because the public policy, even as alluded to by the district court, is one that underlies federal securities law, not Pennsylvania law. Therefore, the analysis with respect to the illegality defense is governed by federal law, not state law. *See Shadis v. Beal,* 685 F.2d 824, 828 (3d Cir.), *cert. denied,* 459 U.S. 970, 103 S.Ct. 300, 74 L.Ed.2d 282 (1982); *Sola Electric Co. v. Jefferson Co.,* 317 U.S. 173, 176, 63 S.Ct. 172, 173, 87 L.Ed. 165

(1942). Furthermore, as this court has held that *Bateman-Eichler* controls, although it addresses the *in pari delicto* defense and not illegality, the policy it presents is also relevant to the illegality defense. It is premised on the assumption that allowing disappointed tippees to sue tippers is ordinarily the better means of discouraging insider trading.

**3.** *See, e.g., Tarasi v. Pittsburgh National Bank,* 555 F.2d 1152 (3d Cir.) (allowing defense), *cert. denied,* 434 U.S. 965, 98 S.Ct. 504, 54 L.Ed.2d 451 (1977); *Malamphy v. Real-Tex Enterprises, Inc.,* 527 F.2d 978 (4th Cir.1975) (per curiam) (allowing defense only in some circumstances); *Keuhnert v. Texstar Corp.,* 412 F.2d 700 (5th Cir.1969) (allowing defense at court's discretion); *Mallis v. Bankers Trust Co.,* 615 F.2d 68 (2d Cir.1980) (defense rejected), *cert. denied,* 449 U.S. 1123, 101 S.Ct. 938, 67 L.Ed.2d 109 (1981).

actions. *See, e.g., Nathanson v. Weis, Voisin, Cannon, Inc.,* 325 F.Supp. 50, 53 (S.D. N.Y.1971). Others, including this court, felt that "the prophylactic impact on the use of inside information that allowance of the defense will lead to" predominated over the deterrence value of nonrecognition of the defense. *Tarasi v. Pittsburgh National Bank, supra,* 555 F.2d at 1163. *Tarasi* had been the controlling authority for this circuit at the time of the original trial in the case at bar. Before this court issued its opinion in the first appeal, however, the Supreme Court resolved the conflict in *Bateman Eichler, Hill Richards, Inc. v. Berner,* 472 U.S. 299, 105 S.Ct. 2622, 86 L.Ed.2d 215 (1985).

In *Bateman Eichler,* the Court noted that the *in pari delicto* doctrine had always required a careful consideration of public policy implications before allowing the defense. *Id.* at 310, 105 S.Ct. at 2628. "[I]mplied private actions," continued the Court, "provide 'a most effective weapon in the enforcement' of the securities laws and are 'a necessary supplement to Commission action.'" *Id.* (quoting *J.I. Case Co. v. Borak,* 377 U.S. 426, 432, 84 S.Ct. 1555, 1559, 12 L.Ed.2d 423 (1964)). Denial of the defense best promotes protection of the investing public because (1) allowing suits by a defrauded tippee will expose wrongdoers and facilitate civil, administrative, and criminal action; (2) placing pressure on insiders will maximize the deterrence of insider trading; (3) insiders are usually more responsive to the pressures of potential sanctions; and (4) tippees are deterred by means other than the *in pari delicto* defense. *Id.* at 315–19, 105 S.Ct. 2631–33. Furthermore, the Court observed that it had "eschewed rigid common-law barriers in construing the securities laws." *Id.* at 310, 105 S.Ct. at 2628.

The Court therefore rejected the *in pari delicto* defense to implied causes of action brought by a tippee against a tipper under the federal securities laws generally, stating the rule in terms of its own two-prong exception:

> [A] private action for damages in these circumstances may be barred on the grounds of the plaintiff's own culpability only where (1) as a direct result of his own actions, the plaintiff bears at least substantially equal responsibility for the violations he seeks to redress, and (2) preclusion of suit would not significantly interfere with the effective enforcement of the securities laws and protection of the investing public.

*Id.* at 310, 105 S.Ct. at 2629. Rejecting the *Tarasi* rule, *id.* at 315, 105 S.Ct. at 2631, the Court concluded that "the public interest will most frequently be advanced if defrauded tippees are permitted to bring suit and to expose illegal practices by corporate insiders...." *Id.* at 319, 105 S.Ct. at 2633.

Because of the possible application of the *Bateman Eichler* exception, a previous panel of this court remanded this case to the district court specifically for the purpose of making factual findings under the new standard announced in that case. *Rothberg v. Rosenbloom,* 771 F.2d 818, 824 (3d Cir.1985).[4] Our primary inquiry thus becomes whether the factual findings[5] made by the district court support its conclusion that Rothberg bore at least substantially equal responsibility in the underlying illegal transactions. We also consider the legal question of the potential effect

---

**4.** Unlike *Bateman Eichler,* which was a section 10(b) suit for securities fraud, Rothberg sued on the promissory notes and guarantee. In light of the previous decision of this court, the question whether the *Bateman Eichler* decision applies to these facts is not addressed.

**5.** As an appellate court, our duty is to accept the ultimate factual determinations of the fact-finder unless they are clearly erroneous. Fed.R. Civ.P. 52(a). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948). This court has consistently been at least as deferential to trial courts' findings of fact as the *Gypsum* standard requires. *See, e.g., Krasnov v. Dinan,* 465 F.2d 1298 (3d Cir.1972).

upon the investing public of precluding this suit.

Only one other circuit has construed *Bateman Eichler.* In *Dahl v. Pinter,* 787 F.2d 985 (5th Cir.1986), the Fifth Circuit gave the extent to which the plaintiff's illegality must outweigh the defendant's before the threshold in the first prong of *Bateman Eichler* is met.[6] That court held that the *in pari delicto* defense applies " 'only where some *unconscionable* act of one coming for relief has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation.' " *Id.* at 988 (quoting *Keystone Miller Co. v. General Excavator Co.,* 290 U.S. 240, 245, 54 S.Ct. 146, 147, 78 L.Ed. 293 (1933)) (emphasis added by the court). The court rejected the tipper's *in pari delicto* defense to the tippee's action under § 12(1) of the Securities Act of 1933.[7]

The Rosenblooms assert that in order to come within the *Bateman Eichler* exception they need only have shown that Rothberg bears at least substantially equal responsibility for the violations of law involved. This is a gross misstatement. First, it ignores entirely the existence of the second prong of the *Bateman Eichler* test. Second, the first prong of the test requires substantially equal responsibility for the violations *that the plaintiff seeks to redress:* here, the plaintiff seeks to redress only the nonpayment of the last set of notes executed in 1979, not any of the insider transactions. *See In re Olympia Brewing Co. Securities Litigation,* 1986 Fed.Sec.L.Rep. (CCH) ¶ 92,461 (N.D.Ill.

1985). The Rosenblooms' quotation of only half of the rule and their alterations of its language distort the Court's meaning almost to the point of inversion.

In support of its conclusion that the first prong of the *Bateman Eichler* test is met, the district court characterized Rothberg as the "instigator" of the insider trading scheme:

> Although Rothberg did not come up with the specific details of the plans to trade on inside information, it was his pressure on David to come up with a means to make Rothberg more money, in short, his greed, that led to the scheme to trade on inside information. . . .

628 F.Supp. at 752–53. This unrealistically presupposes that the tippees contemplated by *Bateman Eichler* are not motivated by "greed," although it is difficult to imagine what motivations other than a desire "to make . . . more money" compel them.

Even assuming that instigating and financing the joint ventures amount to "substantially equal responsibility" under *Bateman Eichler,* it is far from obvious that Rothberg "instigated" these transactions. David Rosenbloom and Selzer, as officers and directors of Nytronics, possessed the inside information, not Rothberg. They had primary responsibility to their principals, and it was they who breached their fiduciary duty to that company. David Rosenbloom's own testimony shows that it was he and Selzer who proposed the scheme to Rothberg, not the other way around.[8] Furthermore, Sanford Rosen-

---

**6.** In itself, this part of the test appears to be inconsistent with the doctrine of *in pari delicto* itself, which by its own name requires only a finding equal fault on the part of the plaintiff, not an analysis of relative fault. *In pari delicto* is a corollary of the equitable "unclean hands" doctrine, which demands not even equal fault.

**7.** In *Dahl,* the tippee, a full time real estate investor, and others had knowingly purchased unregistered securities and sought recission under section 12(1) when the investment soured. The circuit court affirmed the district court's decision in the investors' favor.

**8.** David Rosenbloom testified, inter alia:

Q: What did you and Mr. Selzer do after Mr. Rosenbloom expressed these sentiments [his interest in making more money]?
A. We talked about it a lot; we thought about it a lot. We talked about it again, thought about it again. There just didn't seem to be any way. . . . *However, Mr. Selzer came up with an idea, which he explored first along with me, [of] allowing Mr. Rothberg to participate through inside information in two deals in which he would not participate and one in which I would not participate. That would be a way to make Rothberg some money and at the same time make some money for ourselves.*
628 F.Supp. at 757, n. 7 (emphasis added by district court).

bloom's answer to Rothberg's complaint states that the debts' purpose was "to *induce plaintiff* ... to engage in transactions specifically prohibited by section 10(b) of the Securities Exchange Act of 1934...." (Emphasis added).

David Rosenbloom, the possessor of the inside information, was empowered to act for Rothberg and the others, and himself stood to profit; he did not merely pass along information. The Rosenblooms' contention that Rothberg's request that they provide him with some way of making money to recompense for his assistance in acquiring control of two publicly held companies somehow forced them to divulge inside information is weak indeed. Certainly, they had a *reason* to give Rothberg information, whether it was compensation for his assistance or, more likely, to obtain the use of his money to finance their schemes. A reason for a proposal is not duress. Rothberg's "greed" is no more relevant than the Rosenblooms' own.

Finally, far from supporting the finding that Rothberg was the instigator of the scheme, there is no explanation for what appears to be an additional inducement to Rothberg's participation: the Rosenblooms' agreement to assume the risk of all losses. This indemnification feature makes the scheme look less like an investment and more like a loan from Rothberg to the Rosenblooms and Selzer, to allow the Rosenblooms and Selzer to make much bigger investments on inside information than their own and Selzer's funds permitted, with the *quid pro quo* for the loan being one-half of any profits reaped.[9]

We have reviewed the record and we can find no evidence to support the district court's finding that Rothberg "instigated" the scheme to trade on insider information. The evidence is to the contrary.

The district court characterized Rothberg, from its observation of his testimony, as "an astute, sophisticated and intelligent businessman, extremely careful about detail," *id.* at 758, attributes generally found in most successful and not necessarily overbearing business persons. Although couched as a finding, the court's observation that the plaintiff's "culpable financing of these illegal schemes can fairly be said to outweigh David's weakness in furnishing tips" is actually nothing more than a conclusional statement, not entitled to deference on review. *Id.* at 758. But does such a conclusion bear any rational relationship to the record? An analysis of David's "weakness" reveals that it was nothing more or less than the desire to make money—the same characteristic or "weakness" that motivated Rothberg. The district court attempted to portray David, based on his testimony, as "a weak and dependent tout," but this description is not borne out by the record. David, having graduated from the Wharton School of the University of Pennsylvania and having attended law school, had a history as a successful business entrepreneur. He had served as chairman of the executive committee and a director of Nytronics, Inc. for a half dozen years. He had been a salaried executive, director, and member of the control group of the Mallory Randall Corporation for eight years. Moreover, he had available to him the counsel and services of his brother, a practicing lawyer, and of his close friend, business associate, and securities broker, Benson Selzer.

We perceive nothing in this record that shows Rothberg dominated David's will or exercised any undue influence over him. The evidence demonstrates nothing more than a simple scheme on the part of David and his colleagues to trade on inside information relating to David's corporations. The information indisputably came from David, not Rothberg. The scheme originated with David, his brother, and his close friend. Their objective, like Rothberg's,

---

**9.** The trial judge apparently perceived the arrangement between Rothberg and David Rosenbloom as a loan, for in his analysis of the enforceable warranty theory he contemplated "that the David Rosenblooms of this world would be encouraged to borrow money for inside trading if they had a 'warranty' that they did not have to pay back their lenders." 628 F.Supp. at 758.

was profits; they all shared in them. The Rosenblooms succeeded in having Rothberg advance his money to finance their share of the investments. The Rosenblooms' reliance on Rothberg's loan may be seen by the district court as "dependence"; others may see it as good business judgment, but for the participants' insensitivity to the illegality of the enterprise. We are of the firm belief that the district court's findings relating to the first prong of the *Bateman Eichler* exception are not supported by the evidence and are clearly erroneous.

The second *Bateman Eichler* prong requires a determination that "preclusion of suit would not significantly interfere with the effective enforcement of the securities laws and protection of the investing public." This determination is a matter of policy and our review is plenary. Although the district court concluded that this prong had been met, its reasoning suggests the opposite conclusion.

The district court's opinion strains to distinguish the facts in the case at bar to avoid the rule of *Bateman Eichler*. Because Rothberg, the tippee, was the financier, the court reasoned that denying him relief would "probably discourage insider trading by cutting off the transaction at its root, money." 628 F.Supp. at 758. It is unclear why money, not access to inside information, is the "root." Far from distinguishing the Rothberg-Rosenbloom-Selzer transactions from those addressed by *Bateman-Eichler*, this tippee/financier-tipper/advisor scheme is likely to be the typical, not the exceptional pattern. It certainly seems easier for insiders to find unaware or even unscrupulous investors than for investors to find unscrupulous or careless insiders. Furthermore, in this case the tippers themselves, as well as the tippee, stood to make a profit on the inside information.

Similarly, we are not persuaded by the Rosenblooms' attempt to distinguish this case on the basis that there was a "conspiracy"; although the scheme was collusive, it seems to have been no more so than any other tipper-tippee arrangement. Moreover, the Supreme Court noted that tippers are likely to "be more responsive to the deterrent pressure of potential sanctions; they are more likely than ordinary investors to be advised by counsel." 472 U.S. at 317, 105 S.Ct. at 2632. Sanford Rosenbloom himself is a practicing lawyer of many years, although his specialty is real estate, not securities law. Finally, because the beneficiaries of the duty imposed by § 10(b) are the investing public, common sense suggests that insiders, not tippees, are in the more critical position to abuse the access they enjoy.

The district court added that denying the *in pari delicto* defense to the Rosenblooms would fail to advance the *Bateman Eichler* goal of exposing wrongdoing, because in the case at bar the tipper himself is trying to bring the fraud to light. We disagree. First, the statute of limitations had run for any public enforcement of the securities laws in this case. Second, and more important, this reasoning ignores the fact that the Rosenblooms exposed the wrongdoing only as a defense to Rothberg's suit on the notes. If tippees in his position do not sue their tippers because they know they can be precluded from recovery by the *in pari delicto* defense, then we can expect that their tippers will never expose the wrongdoing as did the Rosenblooms. Denial of the defense here thus will have no real effect on disclosure of wrongdoing, much less "significantly interfere with the effective enforcement of the securities laws."

Thus, the second prong of the *Bateman Eichler* test has not been met. We therefore hold that it was error to make the *in pari delicto* defense available to the defendants.

III.

In sum, the facts of this case do not bring it within the exception to the *Bateman Eichler* rule; the *in pari delicto* defense is thus unavailable to the Rosenblooms.

Accordingly, the judgment of the district court will be reversed and the case remanded with directions to enter judgment on the notes in favor of the plaintiff against the defendants.

Costs taxed against defendants.

SEITZ, Circuit Judge, concurring.

Although I join in the judgment reversing the district court, I write separately because, unlike Judge Rosenn, I am willing to assume that the decision of this court on the prior appeal in this case does not foreclose us from deciding whether *Bateman Eichler, Hill Richards Inc. v. Berner et al.*, 472 U.S. 299, 105 S.Ct. 2622, 86 L.Ed.2d 215 (1985), applies to a contract action.

The Supreme Court announced what I read as a general rule in *Bateman Eichler, supra*, that a defense of *in pari delicto* may not be asserted by a tipper in a damage action by a tippee under Rule 10(b)–5. However, the Court indicated that there could be what may be denominated as an exception to that rule under certain circumstances. Here the district court held that based on its findings of fact the exception applied and the defense of *in pari delicto* barred plaintiff Rothberg's diversity action seeking judgment on two promissory notes.

I emphasize at the outset that although this is a diversity action, the doctrine of *Erie Railroad v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), is not applicable to defenses raised under federal law. As the Supreme Court has explained,

> When a federal statute condemns an act as unlawful, the extent and nature of the legal consequences of the condemnation ... are ... federal questions, the answers to which are to be derived from the statute and the federal policy which it has adopted. To the federal statute and policy, conflicting state law and policy must yield.

*Sola Electric Co. v. Jefferson Electric Co.*, 317 U.S. 173, 176, 63 S.Ct. 172, 174, 87 L.Ed. 165 (1942) (holding that local laws of estoppel are not applicable where the defense asserted in a diversity contract action is based on federal law); *see also Kelly v. Kosuga*, 358 U.S. 516, 519, 79 S.Ct. 429, 431, 3 L.Ed.2d 475 (1959). In the light of such law, and my assumption as to our prior decision, the first issue presented on appeal is whether the policies that led the Supreme Court generally to reject the *in pari delicto* defense in Rule 10(b)–5 actions by tippees against tippers should lead to a rejection of the defense in a contract action based on obligations arising out of the illegal transaction.

The *Bateman Eichler* decision rests on two distinct policy determinations. First, the Supreme Court found that a tipper who breaches his or her fiduciary duties is more culpable than a tippee who trades on the information. 472 U.S. at 313–14, 105 S.Ct. at 2630–31, 86 L.Ed.2d 215. Second, the Supreme Court found that "deterrence of insider trading most frequently will be maximized by bringing enforcement pressures to bear on the sources of such information—corporate insiders and broker dealers." 472 U.S. at 316, 105 S.Ct. at 2632, 86 L.Ed.2d 215. In short, the Supreme Court held that the purposes of federal securities laws generally will be furthered by barring the use of the *in pari delicto* defense in actions by tippees against tippers under Rule 10(b)–5.

Whether the action is brought in contract, as here, or under Rule 10(b)–5, I believe that permitting a tippee to recover against a tipper, and thus barring the *in pari delicto* defense, will further the policies enumerated by the *Bateman Eichler* Court. First, allowing recovery by the tippee regardless of the form of the action will reinforce the notion that tippers are more culpable than tippees. Second, by holding tippers liable, they will be further deterred from breaching their fiduciary duty.[1] Therefore, in my view, the form of

---

1. The district court apparently believed this second statement to be untrue because a tippee could wait until after the statute of limitations had run for federal violations before bringing the contract action. One benefit of permitting Rule 10(b)–5 actions by tippees is that these actions will bring violations to the SEC's attention. *Bateman Eichler*, 472 U.S. at 315–16, 105

the action is not controlling, at least so long as the subject matter arises out of the wrongdoing of the parties or their privies.

But defendants contend, and the district court found, that the exception noted in *Bateman Eichler* [2] applies and renders the *in pari delicto* defense controlling. Since the correctness of this ultimate determination turns on the facts and inferences therefrom, the next major issue is whether, as Rothberg contends, the critical findings of fact made by the district court on this issue are clearly erroneous. On this phase of the case I agree completely with Judge Rosenn's position that based on this record one can only reasonably conclude that such findings are mistaken. I say this with a full realization of the rigorous restraints imposed on our review by F.R.Civ.P. 52(a).

In light of the foregoing analysis, I agree with Judge Rosenn that the general rule of *Bateman Eichler* is controlling. Accordingly, I join in the judgment reversing the judgment of the district court.

SLOVITER, Circuit Judge, dissenting.

I respectfully dissent from the judgment of the court reversing the dismissal of this action and directing the district court to enter judgment for plaintiff Benjamin Rothberg. I cannot accept the legal analysis in Judge Rosenn's opinion announcing the judgment of the court because I believe that this is not a case governed directly by the holding in *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 105 S.Ct. 2622, 86 L.Ed.2d 215 (1985). Although my approach to this case is not markedly different from that taken in Judge Seitz' opinion concurring in the judgment, I evaluate the relevant public policy considerations differently.

## I.

### *Whether Bateman Eichler is Controlling*

Rothberg's suit to recover from the Rosenblooms on notes signed by them was brought as a diversity action based on contract law. The Rosenblooms defended, *inter alia*, on the ground that the promissory notes derived from obligations which were legally unenforceable because they grew out of transactions involving trading on insider information in violation of the federal securities laws. The notes represented an indemnity by the Rosenblooms, who were the insiders, *i.e.*, the tippers, against loss by Rothberg, the tippee, on joint venture transactions that Rothberg funded in stock of companies that would be affected by the inside information. The district court found that the transactions were in fact illegal and this court affirmed those findings. 771 F.2d 818 (3d Cir.1985). The illegality of those insider trading transactions is thus established for purposes of this appeal.

The legal question before us is the effect of the illegality for purposes of Rothberg's right to recover from his joint venturers on their indemnity. Judge Rosenn's opinion is predicated on the applicability of the holding in *Bateman Eichler* to the facts before us despite the significantly different circumstances under which *Bateman Eichler* arose. In *Bateman Eichler*, the Supreme Court had before it a Rule 10(b)–5 private action brought by tippees against their tipper; it held that tippers could not defend that action on the basis of the *in pari delicto* defense. The Court recognized that the defense would nonetheless be available in certain limited circumstances even in Rule 10(b)–5 actions.

Nothing in that decision suggests that its holding applies to suits other than those

S.Ct. at 2631–32, 86 L.Ed.2d 215. I do not believe, however, that this benefit was the determinative factor in the *Bateman Eichler* opinion. Rather, I read the Court to be more concerned with deterring tippers by imposing sanctions on them than with simply providing the SEC with an additional means of discovering violations.

**2.** The Court said that where the plaintiff bears at least substantially equal responsibility for the violations he seeks to redress and preclusion of the action would not significantly interfere with effective enforcement of the securities laws and protection of the investing public the defense would be available.

under the securities law. Justice Brennan meticulously described the question presented as whether the common-law *in pari delicto* defense bars a private action "under the federal securities laws" against corporate insiders. 105 S.Ct. at 2624. The Court rejected the tipper's argument that the holding of *Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968), denying the *in pari delicto* defense in antitrust actions, was inapplicable to securities actions because Congress had not expressly provided for such actions. Instead, the Court concluded "that the views expressed in *Perma Life* apply with full force to implied causes of actions under the federal securities laws." 105 S.Ct. at 2629. Judge Rosenn points to no language in the opinion extending the holding to contract actions based on illegal securities transactions.

Judge Rosenn suggests that "this court has *held* that *Bateman Eichler* controls," Rosenn Op. Typescript at 6 n. 2 (emphasis added), and therefore he does not address the question whether the *in pari delicto* doctrine applies to these facts. *Id.* at 8 n. 4. Presumably, he is invoking this court's policy precluding a subsequent panel from overruling a published opinion of a previous panel. *See* IOP Chapter 8(c), Policy of Avoiding Intra-Circuit Conflict of Precedent. If the prior panel had analyzed the applicability of *Bateman Eichler* to contract actions, and then remanded for findings, we would indeed be barred. However, although the parties filed letter briefs on the issue, *see* App. at 314, the previous panel merely stated that because the district court "did not have [a] passage from the *Bateman Eichler* opinion before it when it made its factual findings and conclusions of law," it was appropriate to remand the matter for that court to make factual findings as to "1) whether Rothberg bears at least 'substantially equal responsibility' for the violations he seeks to redress, and 2) whether preclusion of suit would 'significantly interfere' with the effective enforcement of the securities laws and protections of the investing public."

771 F.2d 818, 824. The remand suggests that the prior panel believed *Bateman Eichler* was relevant, but it should not be viewed as a decision that *Bateman Eichler* was necessarily controlling in contract actions in the absence of any statement to that effect.

We have not infrequently been troubled by the controlling force under IOP 8(c) of a prior panel's decision remanding for further findings. *See Associated Film Distribution Corp. v. Thornburgh*, 800 F.2d 369, 377 n. 3 (3d Cir.1986). If we are to expand our policy requiring adherence to prior panel "opinions" to include matters that were not discussed in those opinions and not necessarily decided, then I believe it should be done by the full court through amendment of our Internal Operating Procedures. Until then, I believe we are free to examine a legal issue not previously reached or necessarily decided. Thus, as stated above, I believe we are free to decide that *Bateman Eichler* does not apply of its own force.

In securities litigation, as in antitrust actions, plaintiffs are acting not only on their own behalf but to supplement enforcement actions by the regulatory bodies. *Bateman Eichler*, 105 S.Ct. at 2628. It enhances the effect of such actions, and thereby the public interest, to preclude the *in pari delicto* defense inasmuch as the defense would impede successful maintenance of actions. For this reason, the Court has "eschewed rigid common-law barriers in construing the securities laws." *Id.* It simply does not follow as a matter of course from *Bateman Eichler* that common-law barriers should be likewise eschewed in common-law actions. Thus, whether the *in pari delicto* defense should be available in a contract action brought by tippees against their tippers involves a different mode of analysis than that used by Judge Rosenn.

II.

*Availability of the In Pari Delicto Defense in Contract Actions*

Judge Seitz states that federal law and federal policy should apply to determine

whether the *in pari delicto* defense is available in contract actions. I do not disagree because any right of Rothberg to recover under the state contracts law must yield to a federal policy expressed in or underlying federal law that would preclude such recovery.

Judge Seitz suggests that the same policy considerations that led the *Bateman Eichler* Court to bar a tipper's use of the *in pari delicto* defense in a Rule 10(b)–5 action would be similarly applicable in contract actions. I cannot agree.

I see two bases for the Court's decision that tippees, albeit not blameless, should be able to sue their tippers under the securities laws unencumbered by the *in pari delicto* defense. One was the Court's conclusion that a tipper who breaches his or her fiduciary duties is more culpable than a tippee who does nothing more than trade on the information. 105 S.Ct. at 2630–31. The Court said, "In the context of insider trading, we do not believe that a person whose liability is solely derivative can be said to be as culpable as one whose breach of duty gave rise to that liability in the first place." *Id.* at 2630. The culpability of the tipper defendant for Rule 10(b)–5 actions is evidenced by the rule requiring the tippee to prove the tipper acted with scienter. 105 S.Ct. at 2633 (citing *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)). The *Bateman Eichler* Court continually stressed that the *in pari delicto* defense would be available if the parties were shown to have substantially equal culpability.

The second basis for the decision barring the tipper's use of the *in pari delicto* defense in Rule 10(b)–5 actions was the Court's view that the public interest would thereby be served since tippers would be deterred through encouragement of tippees' Rule 10(b)–5 actions and the consequential exposure of the underlying illegal trading.

The Court believed that measures designed to deter insider trading are more effectively addressed to tippers than tippees, particularly since prospective tippers constitute a smaller class than prospective tippees. 105 S.Ct. at 2632 and 2632 n. 29 (quoting Comment, *Availability of an In Pari Delicto Defense in Rule 10b–5 Tippee Suits,* 77 Colum.L.Rev. 1084, 1096–97 (1977)). The Court also suggested that tippers as a class are more likely than tippees to be aware of the existence of legal sanctions for trading misconduct, and hence "more responsive to the deterrent pressure of potential sanctions." 105 S.Ct. at 2632. The Court recognized that there may be some disincentive to tippees to bring such actions because they will thereby also expose themselves to possible civil and criminal penalties. 105 S.Ct. at 2633. I assume that the Court believed that the incentive of monetary recovery would overcome the tippee's concern about exposure.

I suggest that any prediction of the deterrent value of the *in pari delicto* defense in contract actions involving insider trading is, at best, speculative. The Supreme Court in *Bateman Eichler* could make a hypothesis about deterrence in the context of Rule 10(b)–5 actions because such suits are typically brought by a disappointed tippee who has incurred a loss in trading based on inside information that was intentionally false or misleading. In contrast, there is no readily discernible pattern in contract actions by tippees. We do not have sufficient data through reported cases. Such actions would probably be fact-specific, depending on the nature of the contract and the conduct. If we hypothesize any pattern at all to contract actions, it is likely to be one, as in this case, where the tipper and tippee have agreed on a joint venture to trade on insider information. A breach of contract suit by a tippee may be brought on a variety of claims, such as failure to adhere to the contract terms, supplying false information or misappropriating the proceeds.

I am considerably less comfortable than my brethren in predicting whether disallowance of the *in pari delicto* defense to the tipper will deter such arrangements in the future. I recognize that such a defense may deter some contract actions, but I

believe that the exposure of insider trading through suits between the parties is more likely to occur in federal securities actions, which have been implied for such a purpose. Public exposure of the illegal securities scheme will only occur in contract actions if the defendant tipper is permitted to raise the *in pari delicto* defense. Even if the time has passed for any sanctions under the securities laws, there is a public benefit to be gained by bringing the facts to light.

Thus, I would hold that the public policy considerations that underlay the *Bateman Eichler* holding precluding the tipper's use of the *in pari delicto* defense in securities litigation are inapplicable to the tipper's defense in a contract action arising out of a conspiracy between the tipper and tippee to misuse inside information for their mutual benefit. Since the joint venture for illegal purposes is the paradigmatic situation for application of the common law *in pari delicto* defense, I see no reason not to apply it to common law contract actions between tippees and tippers.

I turn next to the other prong of the *Bateman Eichler* analysis, the relative responsibility of the tipper and tippee. Even if we assume that the tipper is ordinarily more culpable, as the Supreme Court stated, the Court nonetheless recognized that there may be particular instances in which this is not the fact: "[S]ituations might well arise in which the relative culpabilities of the tippee and his insider source merit a different mix of deterrent incentives." 105 S.Ct. at 2632. The joint venture to trade on inside information is likely to be one such situation. In any event, whether the tippee bore substantially equal responsibility depends on the district court's factual findings, and I cannot agree that in this case they are clearly erroneous.

I agree with my colleagues that the written record does not support the district court's findings that Rothberg instigated the inside trading scheme and that Rothberg dominated David Rosenbloom's will or exercised undue influence over him. I recognize that the district court may have relied on impressions from the demeanor of the witnesses to which we must defer, but the findings are inconsistent with Rosenbloom's testimony that, in fact, he and Selzer, under pressure from Rothberg to make Rothberg some money, proposed the scheme to Rothberg. App. at 187. In addition, there is simply nothing in the record to indicate that Rothberg's demand for profits amounted to coercion on Rosenbloom.

However, *Bateman Eichler* does not require either instigation or coercion before the *in pari delicto* defense can be used. It merely requires "substantially *equal* responsibility." The record adduced in the district court supports a finding that Rothberg bore at least that much responsibility, even if he was not more culpable.

As the district court found, and as the record supports, Rothberg is unlike the ordinary tippee predicated in the *Bateman Eichler* opinion. He was a sophisticated investor who had served as director of public corporations and had participated in mergers and stock syndications. App. at 120, 186. Nothing suggests that Rothberg was the passive recipient of the inside information.

On the contrary, Rothberg played an active role in structuring and financing the scheme.[1] He had at least enough leverage to extract from the Rosenblooms the highly unusual indemnity against loss, thereby guaranteeing himself the very "enforceable warranty" that the *Bateman Eichler* Court found tippees would not be able to

---

1. Rothberg's active role in determining the terms of the agreements is evidenced by a memo from Sanford Rosenbloom concerning alterations in the agreements:

    Today I spoke to Ben Rothberg about the matter of Joint Ventures. He told me that because it was the understanding that he would pay all interest for obtaining funds for

the use of the Joint Venture and because he is to be entitled to all dividend or interest income from the Joint Venture, hereafter Joint Venture Agreements should be simplified to take out the present wording about expenses and insert wording per the understanding. App. at 331.

get through Rule 10(b)–5 actions. Moreover by 1979, when Rothberg obtained the promissory notes on which this suit is based, he was well aware of the illegality of insider information trading, since he had been obliged, following an SEC investigation, to disgorge the proceeds of a similar transaction. *See SEC v. Shapiro*, 349 F.Supp. 46, 48 (S.D.N.Y.1972), *aff'd*, 494 F.2d 1301 (2d Cir.1974). He was able to bring the present contract action without fear of criminal or civil proceedings only because he withheld filing this suit until the statute of limitations had run on any possible suit against him for securities law violations.

Although I am not persuaded by the Rosenblooms' portrayal of themselves as naive and innocent participants, neither do I see any basis for this court to view Rothberg as any less culpable.

I believe that my colleagues, in stressing the lack of evidence as to Rothberg's instigation or coercion, have failed to focus on the relevant factual issue, which is whether Rosenberg was at least as culpable as the Rosenblooms. Since he was a sophisticated investor who invested in excess of $1,300,-000 in the series of six insider transactions to which these notes are related, and since he was able to extract a warranty against any losses from that trading, I believe that we cannot denominate the district court's finding that he bore substantially equal responsibility as clearly erroneous.

The *Bateman Eichler* Court derived the "substantially equal responsibility" inquiry from the earlier opinions in *Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968). There, the Court disallowed a franchisor from asserting the *in pari delicto* defense against an antitrust suit brought by several of its franchisees. The plurality concluded that the dealers were not equally culpable because their agreement to the illegal contract clauses was not voluntary but "solely because their acquiescence was necessary to obtain an otherwise attractive business opportunity." 392 U.S. at 139, 88 S.Ct. at 1984. Justice Marshall, while agreeing that mere partic-

ipation in the agreement should not bar the dealers from recovering damages, asserted:

> However, if [the franchisor] could show ... that petitioners *actually participated in the formulation of the entire agreement*, trading off anticompetitive restraints on their own freedom of action ... for anticompetitive restraints intended for their benefit ... petitioners should be barred from seeking damages as to the agreement.

392 U.S. at 150, 88 S.Ct. at 1990 (Marshall, J., concurring) (emphasis added).

As shown, Rothberg "actually participated in the formulation of the entire agreement." Where, as here, the tippee provided the financing, pressured the insiders to produce money-making schemes, participated in the structuring of the scheme and intended to profit from that scheme, he should be found to bear "substantially equal responsibility" for that scheme. When his suit is not brought for fraud under the securities laws but instead relies on a contractual warranty included in that scheme, his recovery should be barred based on the still widespread principle "that a wrongdoer shall not be permitted to profit through his own wrongdoing." *Id.* at 151, 88 S.Ct. at 1990.