Nos. 94-3714 & 94-3856

United States of America,        *
                                          *

        Plaintiff-Appellee/     *
        Cross-Appellant,        *      Appeals from the United States
                                          *      District Court for the
   v.                          *      District of Minnesota.
                                          *

James Herman O'Hagan,       *
                                          *

        Defendant-Appellant/    *
        Cross-Appellee.        *

_____

Submitted:  October 17, 1995

Filed:  August 2, 1996
_____

Before FAGG, LAY, and HANSEN, Circuit Judges.
_____

HANSEN, Circuit Judge.

James Herman O'Hagan appeals his convictions of all counts in a 57-count indictment for mail fraud, securities fraud, and money laundering. The government cross-appeals, contending that the district court erroneously calculated O'Hagan's sentence. Although O'Hagan raises a whole host of issues, we find merit in two particular claims. First, neither the statutory language of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), nor Supreme Court precedent interpreting it, will support the use of the "misappropriation theory," the theory which formed the basis for O'Hagan's § 10(b) securities fraud convictions. Second, the Securities and Exchange Commission (SEC) exceeded its rulemaking authority under section 14(e) of the Securities Exchange

Act of 1934, 15 U.S.C. § 78n(e), when it promulgated Rule 14e-3(a), 17 C.F.R. § 240.14e-3(a), and omitted therefrom the requirement that a breach of a fiduciary duty must be shown in order to violate the rule. The mail fraud counts are structured in the indictment to hinge on the validity of the securities fraud counts, and the money laundering counts in turn are dependent upon the mail fraud or securities fraud counts. Accordingly, we vacate all of O'Hagan's convictions. The government's cross-appeal is dismissed as moot.

## I.

James Herman O'Hagan was a partner in the Dorsey & Whitney law firm in Minneapolis, Minnesota. In approximately July of 1988, Grand Met PLC (Grand Met), a large diversified company based in London, England, retained Dorsey & Whitney as local counsel because Grand Met was interested in acquiring the Pillsbury Company (Pillsbury), a Minneapolis, Minnesota, company. Throughout the remainder of the summer and into the fall of 1988, Grand Met maintained a continued interest in acquiring Pillsbury, but before moving forward with an actual tender offer, it first had to sell a subsidiary company in order to have sufficient capital to finance the purchase of Pillsbury.

On August 18, 1988, O'Hagan began purchasing call options for Pillsbury stock that had a September 17, 1988, expiration date.[1] He subsequently purchased call options that had October 22, 1988,

---

[1]A call option gives the holder the right to purchase a specified number of shares of stock by a certain date at a specific price. If the shares are not purchased by that date, the option expires and along with it the right to purchase the specified number of shares. For instance, on August 18, 1988, O'Hagan purchased 100 Pillsbury call options. Each call option gave him the right to purchase 100 shares of Pillsbury stock. Each call option also expired on September 17, 1988, if the option was not exercised.

and November 19, 1988, expiration dates.  By the end of September 1988, O'Hagan had amassed 2,500 Pillsbury call option contracts.[2]  He also held approximately 5000 shares of Pillsbury common stock which he had purchased on September 10, 1988.

On October 4, 1988, Grand Met publicly announced its tender offer for Pillsbury stock.  Pillsbury stock immediately rose from $39 per share to almost $60 per share.[3]  Shortly thereafter, O'Hagan exercised his options, purchasing the Pillsbury stock at the lower option price, and then liquidating the stock, along with the previously purchased 5000 shares of common stock, for the higher market price generated by the tender offer. He realized a profit of over $4,000,000 from these securities transactions.

The Securities and Exchange Commission (SEC) subsequently commenced an investigation of O'Hagan and others who had heavily invested in Pillsbury securities shortly before its takeover by Grand Met.  This investigation, which was later joined by other federal law enforcement authorities, culminated with O'Hagan being charged in the instant 57-count indictment.  Counts 1-20 charged him with mail fraud in violation of 18 U.S.C. § 1341.  Counts 21-37 charged him with securities fraud in violation of § 10(b) and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder. Counts 38-54 charged O'Hagan with securities fraud in violation of § 14(e) and Rule 14(e)-3, 17 C.F.R. § 240.14e-3(a), promulgated thereunder.  Counts 55-57 alleged various violations of the federal money laundering statutes, 18 U.S.C. §§ 1956(a)(1)(B)(i) and 1957.

---

[2]O'Hagan purchased 3,000 Pillsbury call option contracts during August and September 1988.  At the end of September of 1988, he held only 2,500 of those contracts because 500 contracts had a September 17, 1988, expiration date.

[3]"When a tender offer is announced, usually the price of the target company rises and the price of the offeror falls or remains the same."  SEC v. Maio, 51 F.3d 623, 628 n.3 (7th Cir. 1995).

The case proceeded to trial, and a jury convicted O'Hagan on all 57 counts. The district court sentenced O'Hagan to 41 months of imprisonment. O'Hagan appeals.

II.

Because we resolve the issues in this case solely on legal grounds, our standard of review is de novo. <u>United States v. Hang</u>, 75 F.3d 1275, 1279 (8th Cir. 1996).

A.

O'Hagan challenges his § 10(b) securities fraud convictions, arguing that the theory of liability under which the government prosecuted him, known as the "misappropriation theory," is, as a matter of law, an impermissible basis upon which to impose § 10(b) liability. Before outlining the misappropriation theory, however, we first turn to the language of § 10(b) and its SEC-created counterpart, Rule 10b-5.

Section 10(b) of the Securities Exchange Act of 1934 provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange--
>
> . . .
>
> (b) To use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

-4-

15 U.S.C. § 78j(b).  The touchstones of § 10(b) liability then, are "manipulation" and "deception" "in connection with the purchase or sale of any security."  Id.  Our focus in this case is on the deception element of § 10(b).[4]

Acting pursuant to the authority granted to it under § 10(b), the SEC promulgated Rule 10b-5, which provides in relevant part:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) [t]o employ any device, scheme, or artifice to defraud, [or]
>
> . . .
>
> (c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  The SEC thus enacted Rule 10b-5 to include a prohibition on "fraud" as a means of defining the scope of conduct proscribed by the term deception under § 10(b).  Significantly, however, fraud under Rule 10b-5 cannot be construed more broadly than its statutory enabler, deception; in other words,

---

[4]The other prong of § 10(b) liability, "manipulation" is "`virtually a term of art when used in connection with securities markets'" referring to practices "such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity."  Santa Fe Indus. v. Green, 430 U.S. 462, 476 (1977) (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 199 (1976)).  The government does not contend, and the record does not show, that O'Hagan's conduct constituted any of these prohibited acts.  In any event, the misappropriation theory thus far has been used only as a vehicle to prosecute acts that constitute deception under § 10(b) and that was the government's approach in this case.

Rule 10b-5 fraud cannot prohibit conduct that does not amount to § 10(b) deception.  See Central Bank of Denver v. First Interstate Bank of Denver, 114 S. Ct. 1439, 1446 (1994) ("We have refused to allow 10b-5 challenges to conduct not prohibited by the text of the statute."); Santa Fe Indus. v. Green, 430 U.S. 462, 472 (1977) ("in deciding whether [challenged conduct constitutes] `fraud' under Rule 10b-5, `we turn first to the language of § 10(b),'" (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 197 (1976)).  Thus, although § 10(b) has been described as a broad catchall provision, the fraud that must be caught must also constitute deception within the meaning of the statute.  United States v. Chiarella, 445 U.S. 222, 234-35 (1980) ("Section 10(b) is aptly described as a catchall provision, but what it catches must be fraud.").

In construing the scope of conduct that may be regulated under § 10(b), the Supreme Court has definitively ruled that the text of the statute is dispositive.  See Central Bank, 114 S. Ct. at 1436 ("With respect . . . to . . . the scope of conduct prohibited by § 10(b), the text of the statute controls our decision."); see also Chiarella, 445 U.S. at 234 ("As we have emphasized before, the 1934 Act cannot be read `"more broadly than its language and the statutory scheme reasonably permit."'" (citation omitted)).  This point could not have been made in clearer terms than in Central Bank, the Court's most recent exposition of the reach of § 10(b).  There, concluding that a § 10(b) aiding and abetting cause of action was not viable, the Court stated:

> We reach the uncontroversial conclusion, accepted even by those courts recognizing a § 10(b) aiding and abetting cause of action, that the text of the 1934 Act does not itself reach those who aid and abet a § 10(b) violation.  Unlike those courts, however, we think that conclusion resolves the case.  It is inconsistent with settled methodology in § 10(b) cases to extend liability beyond the scope of conduct prohibited by the statutory text.
>
> . . .

Because this case concerns the conduct prohibited
by § 10(b), the statute itself resolves the case. . .
.

Central Bank, 114 S. Ct. at 1448.  This is because "[t]he language of
§ 10(b) gives no indication that Congress meant to prohibit any conduct not
involving manipulation or deception."  Santa Fe, 430 U.S. at 473.  In sum,
in determining whether conduct falls within § 10(b) deception and Rule 10b-
5 fraud, we are confined to what the term deception under § 10(b) will
reasonably bear.  See United States v. Bryan, 58 F.3d 933, 945 (4th Cir.
1995) ("For at least two decades, however, the Supreme Court has repeatedly
warned against expanding the concept of fraud in the securities context
beyond what the words of the Act will reasonably bear.").  It is against
this backdrop that we now turn to the two theories of liability which have
been created under § 10(b)'s proscription of deception.

The first theory is what has been termed the "classical theory.  See
SEC v. Clark, 915 F.2d 439, 443 (9th Cir. 1990).  It was outlined by the
Supreme Court in the germinal case of Chiarella, 445 U.S. at 226-35, and
later refined in Dirks v. SEC, 463 U.S. 646, 653-667 (1983).  "Under the
classical theory, a person violates [Rule 10b-5] when he or she buys or
sells securities on the basis of material, non-public information and at
the same time is an insider of the corporation whose securities are
traded."  SEC v. Cherif, 933 F.2d 403, 408 (7th Cir. 1991), cert. denied,
502 U.S. 1071 (1992).  The gravamen of the classical theory is that the
"insider owes a fiduciary duty to the corporation's shareholders not to
trade on inside information for his personal benefit."  Id. at 409.  In
sum, the classical theory deals with corporate "insiders," i.e., those who
owe a fiduciary obligation to the shareholders of the corporation whose
shares are traded.  This theory, however, does not reach those individuals
who trade securities based on material, nonpublic information and who owe
no fiduciary duty to the shareholders of the company whose securities

are traded; these persons are the so-called "outsiders."  See Clark, 915
F.2d at 443.

The misappropriation theory addresses those not within the reach of
the classical theory.  Specifically, it:

> extends the reach of Rule 10b-5 to outsiders who would
> not ordinarily be deemed fiduciaries of the corporate
> entities in whose stock they trade.  [It] focuses not
> on the insider's fiduciary duty to the issuing company
> or its shareholders but on whether the insider
> breached a fiduciary duty to any lawful possessor of
> material non-public information.

Cherif, 933 F.2d at 409.  The misappropriation theory has been held to
impose § 10(b) and Rule 10b-5 liability for fraud on an individual who
"`(1) misappropriates material nonpublic information (2) by breaching a
duty arising out of a relationship of trust and confidence and (3) uses
that information in a securities transaction, (4) regardless of whether he
owed any duties to the shareholders of the traded stock.'"  Bryan, 58 F.3d
at 944 (quoting Clark, 915 F.2d at 443).  Under the misappropriation
theory, the requirement that the information be used "in connection with
the purchase and sale of any security" is satisfied simply because the
misappropriated information is used in a subsequent securities transaction.
See id. at 944-45.  The misappropriation theory thus focuses on whether the
securities trader breached a fiduciary obligation to the party from whom
the material nonpublic information was obtained, notwithstanding whether
that party had any connection to, or even an interest in, the securities
transaction, and also without concern as to whether a party who did care
about the securities transaction was defrauded.  Id.

In this case, the government proceeded against O'Hagan on the § 10(b)
and Rule 10b-5 counts under the misappropriation theory, although the
theory has never been recognized in this circuit.  The government contended
that O'Hagan breached a fiduciary duty to

Dorsey & Whitney and Grand Met when, through his employment at Dorsey & Whitney, he obtained confidential, material, and nonpublic information concerning Grand Met's interest in acquiring Pillsbury, and subsequently used that information as a basis for trading in Pillsbury securities.[5] O'Hagan contends that the misappropriation theory is an impermissible basis upon which to impose § 10(b) liability. Specifically, he argues that the theory cannot be squared with either the plain text of § 10(b) or the Supreme Court's teachings regarding the scope of conduct that may be regulated under that statute.

Neither the Supreme Court nor this court has yet determined whether the misappropriation theory is a permissible basis upon which to impose § 10(b) liability.[6] After carefully studying the

---

[5]The government did not prosecute O'Hagan under the classical theory, nor could it, because O'Hagan was not an "insider" of Pillsbury, the corporation in whose shares he traded. The government conceded before the magistrate judge that O'Hagan could not be prosecuted under Rule 10(b)-5 for failure to disclose the inside information to Pillsbury stockholders because he had no preexisting fiduciary duty to them and had done nothing to induce the officers and directors of Pillsbury to place their trust or confidence in him. Report and Recommendation of Magistrate Judge Cudd (Sept. 10, 1993), App. at 672-73. The magistrate judge's report and recommendation, adopted by the district court, concluded that "[a]s far as Pillsbury stockholders were concerned, Defendant was free under Chiarella and Dirks to use the alleged inside information as he saw fit." Id. at 673. Thus, our attention is focused solely on the misappropriation theory.

[6]In Carpenter v. United States, 484 U.S. 19, 24 (1987), an evenly divided Court affirmed a § 10(b) criminal conviction premised on the misappropriation theory, without expressing any views on the validity of the theory. Further, in Chiarella, 445 U.S. at 235-36, the Court declined to consider the government's argument that the misappropriation theory was a permissible basis upon which to affirm the defendant's § 10(b) conviction because such a theory had not been submitted to the jury.

With respect to this court, as far as we can tell, this is the only case in which the misappropriation theory of § 10(b) liability has been presented to us.

Supreme Court's teachings on the scope of conduct reachable under § 10(b), however, coupled with the recent <u>Central Bank</u> ruling that the plain text of the statute controls this issue, we hold that § 10(b) liability cannot be based on the misappropriation theory. We reach this conclusion because, contrary to § 10(b)'s explicit requirements, the misappropriation theory does not require "deception," and, even assuming that it does, it renders nugatory the requirement that the "deception" be "in connection with the purchase or sale of any security."

We first turn our attention to the meaning ascribed to § 10(b) by the Supreme Court. That Court has repeatedly held that the deception prohibited under § 10(b) consists of the making of a material misrepresentation or the nondisclosure of material information, in violation of a duty to disclose. <u>See, e.g.</u>, <u>Central Bank</u>, 114 S. Ct. at 1446-48; <u>Santa Fe</u>, 430 U.S. at 470, 476. The <u>Santa Fe</u> Court, in fact, explicitly rejected the lower court's reading of § 10(b) which required no misrepresentation or nondisclosure. <u>Santa Fe</u>, 430 U.S. at 470-76. The <u>Central Bank</u> Court confirmed that misrepresentation or nondisclosure are requirements for § 10(b) liability. <u>See</u> <u>Central Bank</u>, 114 S. Ct. at 1448 ("As in earlier cases considering conduct prohibited by § 10(b), we again conclude that the statute prohibits only the making of a material misstatement (or omission) or the commission of a manipulative act.").

Additionally, the Court has left no doubt that § 10(b) deception cannot be premised on the mere breach of a fiduciary duty, without an accompanying misrepresentation or lack of disclosure. <u>See</u> <u>id.</u> at 1446 ("deception" under § 10(b) does not encompass "`breaches of fiduciary duty . . . without any charge of misrepresentation or lack of disclosure.'" (quoting <u>Santa Fe</u>, 430 U.S. 470)). <u>See</u> <u>also</u> <u>Santa Fe</u> 430 U.S. at 472 (to interpret "fraud" under Rule 10b-5 to extend to all breaches of fiduciary

duty that are linked to a securities transaction would "add a gloss to the operative language of the statute quite different from its commonly accepted meaning.") (internal quotations omitted); Dirks, 463 U.S. at 654 ("Not all breaches of fiduciary duty in connection with a securities transaction . . . come within the ambit of Rule 10b-5.  There must also be manipulation or deception.") (internal quotations omitted).

We reject the misappropriation theory, in part, because it permits the imposition of § 10(b) liability based upon the mere breach of a fiduciary duty without a particularized showing of misrepresentation or nondisclosure.  As previously stated, the misappropriation theory bases liability upon the mere misappropriation of material nonpublic information in breach of a fiduciary obligation and subsequent use of that information in a securities transaction.  Clark, 915 F.2d at 443.  By its very definition then, it does not require either a material misrepresentation or nondisclosure.  Thus, the misappropriation theory runs counter to the Santa Fe and Central Bank holdings that the mere breach of a fiduciary obligation, without misrepresentation or nondisclosure, is not deception within the meaning of § 10(b).  See Bryan, 58 F.3d at 949 (breach of fiduciary obligation without misrepresentation or nondisclosure does not constitute deception and thus conflicts with Central Bank and Santa Fe).

We need not tarry long on this point, however, because the misappropriation theory fails on another, more obvious, basis.  The language of § 10(b) requires that the fraud be "in connection with the purchase or sale of any security."  The misappropriation theory, however, permits liability for a breach of duty owed to individuals who are unconnected to and perhaps uninterested in a securities transaction, thus rendering meaningless the "in connection with . . ." statutory language. As noted by the Fourth

Circuit, "The [Supreme] Court has left no doubt that the principal concern of section 10(b) is the protection of purchasers and sellers of securities." Bryan, 58 F.3d at 946-47. We agree. A careful reading of the Supreme Court's decisions in Chiarella, Dirks, and Central Bank reveals that only a breach of a duty to parties to the securities transaction or, at the most, to other market participants such as investors, will be sufficient to give rise to § 10(b) liability.

This principle was explicitly stated in Chiarella. There, relying upon common law fiduciary principles, the Court held that one commits Rule 10b-5 fraud by failing to disclose material non-public information in violation of a duty to disclose. Chiarella, 445 U.S. at 228. This duty to disclose, however, arises only "from a relationship of trust and confidence between parties to a transaction." Id. at 230 (emphasis added). The Court reiterated this point later in the opinion, stating that liability could be founded only on the breach of a fiduciary duty by "a person in whom the sellers had placed their trust and confidence." Id. at 232.

The Dirks Court reaffirmed this principle, stating "that `[a] duty [to disclose] arises from the relationship between parties . . . and not merely from one's ability to acquire information because of his position in the market.'" Dirks, 463 U.S. at 657-58 (quoting Chiarella, 445 U.S. at 232-33). Although the Court referred only to "parties," rather than "parties to a transaction," as in Chiarella, the Court gave no indication that it intended to retreat from Chiarella's holding. To the contrary, the Dirks Court stated early in its opinion that the duty to disclose crafted in Chiarella was applicable only to the corporation whose securities were being traded. See id. at 654 ("We were explicit in Chiarella in saying that there can be no duty to disclose where the person who has traded on inside information `was not [the corporation's] agent, . . . was not a fiduciary, [or] was not a person in whom the

sellers [of the securities] had placed their trust and confidence.'" (quoting <u>Chiarella</u>, 445 U.S. at 232)). The Court did indicate, however, that if § 10(b) was to be construed to reach beyond parties to the securities transaction, at the very most it extended to market participants, namely investors. <u>See</u> <u>id.</u> at 664 n.23 ("a violation [of § 10(b)] may be found only where there is `intentional or willful conduct designed to deceive or defraud investors.'" (quoting <u>Ernst & Ernst</u>, 425 U.S. at 199)).

Finally, the <u>Central Bank</u> Court clearly placed the focus of § 10(b) on purchasers and sellers of securities: "Any person or entity, including a lawyer, accountant, or bank, who employs a manipulative device or makes a material misstatement (or omission) on which <u>a purchaser or seller of securities</u> relies may be liable as a primary violator under 10b-5, assuming all of the requirements for primary liability under Rule 10b-5 are met." 114 S. Ct. at 1455 (emphasis added). The Court also reaffirmed the principle it had set forth in <u>Dirks</u> that, if construed to reach beyond the purchasers and sellers to a securities transactions, § 10(b) at the very broadest can be read to reach only market participants. <u>See</u> <u>id.</u> at 1446 (stating that "the broad congressional purposes behind the [Securities] Act" is "to protect investors from false and misleading practices that might injure them."). <u>See also</u> <u>Bryan</u>, 58 F.3d at 948, 950 (if construed to reach beyond purchasers and sellers of securities, outer boundary of § 10(b) reaches no further than other market participants).

Against this venerable body of law, the misappropriation theory, which allows the imposition of § 10(b) liability even though no market participant was deceived or defrauded, cannot be defended. By evading the statutorily required nexus that the fraud be "in connection with the purchase or sale of any security," the misappropriation theory essentially turns § 10(b) on its head, "transforming it from a rule intended to govern and protect

relations among market participants" into an expansive "general fraud-on-the-source theory" which seemingly would apply to an infinite number of trust relationships. <u>Bryan</u>, 58 F.3d at 950; <u>see also</u> <u>id.</u> at 951 (observing that courts have applied the misappropriation theory to a wide variety of trust relationships and if taken to its logical conclusion would apply to case of simple theft by an employee). Such a wide ranging application of § 10(b) liability simply cannot be reconciled with the <u>Central Bank</u> holding that the text of § 10(b) governs the scope of conduct which may be regulated under that provision, coupled with the focus in <u>Chiarella</u>, <u>Dirks</u>, and <u>Central Bank</u> on parties to the securities transaction or, at most, other market participants. <u>See also</u> <u>id.</u> at 950 (the misappropriation theory "artificially divides into two discrete requirements--a fiduciary breach and a purchase or sale of securities--the single indivisible requirement of deception upon the purchaser or seller of securities, or upon some other person intimately linked with or affected by a securities transaction.").

The government contends that "[t]he in connection with element is met whenever a fraud touches the purchase or sale of a security, a standard which has been described as being very tenuous indeed." Gov. Br. at 48 n.37 (inner quotations omitted). This "touch" test stems from a passage in <u>Superintendent of Ins. v. Bankers Life & Casualty Co.</u>, 404 U.S. 6, 12-13 (1971), where the court stated, "The crux of the present case is that [the victim] suffered an injury as a result of deceptive practices <u>touching</u> its sale of securities as an investor." (emphasis added). According to the government, the Court's use of "touch" demonstrates that the fraud need not be upon a party interested in a securities transaction.

We decline to ascribe such broad meaning to this single passage from <u>Bankers Life</u>. Such a sweeping interpretation appears to be inconsistent with the Court's statement in the immediately previous paragraph of <u>Bankers Life</u> that "we read § 10(b) to mean

-14-

that Congress meant to bar deceptive devices and contrivances <u>in the purchase or sale of securities</u>." <u>Bankers Life</u>, 404 U.S. at 12 (emphasis added). More importantly, the victim of the fraud in <u>Bankers Life</u> was a seller of securities who was "injured as an investor." <u>Id.</u> at 10; <u>see also Bryan</u>, 58 F.3d at 950 n.17 (same). Finally, if this passage held the all-encompassing meaning the government attributes to it, then we cannot fathom how the defendants in the subsequent <u>Chiarella</u>, <u>Dirks</u>, and recently <u>Central Bank</u> cases escaped § 10(b) liability because each engaged in acts that "touched" the securities transaction.[7]

Several of our sister circuits have concluded that § 10(b) liability may be predicated on the misappropriation theory, while the Fourth Circuit recently reached the opposite conclusion, rejecting outright the misappropriation theory as a basis for imposing § 10(b) liability. <u>See Bryan</u>, 58 F.3d at 933. We find the analysis from <u>Bryan</u> persuasive and have borrowed heavily from it in arriving at our conclusion. Therefore, we adopt that court's analysis in its entirety as our own.[8]

---

[7]The government pointed out in oral argument that we have cited <u>Bankers Life</u> and employed its "touch" in several cases. <u>See</u> <u>Harris v. Union Elec. Co.</u>, 787 F.2d 355, 368 (8th Cir.), <u>cert. denied</u>, 479 U.S. 823 (1986); <u>United States v. Gruenberg</u>, 989 F.2d 971, 976 (8th Cir.) (quoting <u>Harris</u>), <u>cert. denied</u>, 114 S. Ct. 204 (1993). From this, the government contends that we have held that only a tenuous connection need be established between the fraud and the securities transaction, and applying that reasoning to this case, we must uphold O'Hagan's § 10(b) convictions. We have not held, however, nor could we in the face of the Supreme Court authority cited above, that the person defrauded need not be an individual who has an interest or stake in a securities transaction. We simply held in these cases that the "touch" test is easily satisfied as long as the party defrauded is a market participant.

[8]<u>Bryan</u> was decided after the briefing had been completed in this case but prior to oral argument. The parties addressed the applicability of <u>Bryan</u> at oral argument. The government contends that <u>Bryan</u> holds that when information is misappropriated from a nonmarket participant, no fraud occurs under § 10(b); conversely when information is misappropriated from a market participant, fraud for the purposes of § 10(b) has occurred. In making this argument, the government contends that <u>Bryan</u> did not really

-15-

We have read with care the cases in which our sister circuits, namely the Second,[9] the Seventh,[10] the Ninth,[11] and, arguably, the Third,[12] have adopted the misappropriation theory. With all due respect to these courts, for the most part, they seem to adopt the misappropriation theory without conducting a rigorous analysis of the text of § 10(b) and Supreme Court precedent. The genesis of

---

depart from the holdings of other circuits and that no split in the circuits is present. We decline to read <u>Bryan</u> in the narrow fashion urged by the government. The <u>Bryan</u> court's holding rejected the misappropriation theory in sweeping terms. <u>See</u> <u>Bryan</u>, 58 F.3d at 944 ("We conclude that neither the language of section 10(b), Rule 10b-5, the Supreme Court authority interpreting these provisions, nor the purposes of these securities fraud provisions, will support convictions resting on the particular theory of misappropriation adopted by our sister circuits."). It did not, contrary to the government's contention, make a distinction between market v. nonmarket participants. In fact, had it done so, there would have been no need to explicitly disagree with the holdings from other courts which have adopted the misappropriation theory because the overwhelming majority of those cases has involved market participants.

[9]<u>See, e.g.</u>, <u>United States v. Libera</u>, 989 F.2d 596, 599-600 (2d Cir.), <u>cert. denied sub nom. Sablone v. United States</u>, 114 S. Ct. 467 (1993); <u>United States v. Chestman</u>, 947 F.2d 551, 564 (2d Cir. 1991) (en banc), <u>cert. denied</u>, 503 U.S. 1004 (1992); <u>United v. Newman</u>, 664 F.2d 12, 16-19 (2d Cir. 1981) (subsequent case history omitted).

[10]<u>See</u> <u>Sec v. Maio</u>, 51 F.3d 623, 631 (7th Cir. 1995); <u>Cherif</u>, 933 F.2d at 410.

[11]<u>See</u> <u>SEC v. Clark</u>, 915 F.2d at 453.

[12]<u>See</u> <u>Rothberg v. Rosenbloom</u>, 771 F.2d 818, 822 (3d Cir. 1985), <u>rev'd after remand</u>, 808 F.2d 252 (1986), <u>cert. denied</u>, 481 U.S. 1017 (1987). Courts that have discussed the misappropriation theory posit that the Third Circuit embraced it in <u>Rothberg</u>. We believe this is fairly debatable however, because the court devoted a mere paragraph to the principles underlying the theory, coupled with a citation to <u>Newman</u>. <u>Id.</u> at 822. In any event, we will assume for the purposes of this case that the <u>Rothberg</u> court adopted the theory.

-16-

the misappropriation theory, the Second Circuit's holding in United v. Newman, 664 F.2d 12, 16-19 (2d Cir. 1981) (subsequent case history omitted), is emblematic. There, the court held that "deceitful misappropriation of confidential information by a fiduciary" was fraudulent under Rule 10b-5 and was "in connection with the purchase or sale of any security" because his "sole purpose in participating in the misappropriation of confidential takeover information was to purchase shares of the target companies." Id. at 18. However, the Newman court did not quote or discuss the language of § 10(b), did not cite Santa Fe, and only mentioned in passing the majority opinion in Chiarella. The court validated the misappropriation theory on the language of Rule 10b-5, Chief Justice Burger's dissent in Chiarella, and other areas of law in which the misappropriation of property has been held to be criminal. We take pause to note that the language of § 10(b), not Rule 10b-5, determines the scope of conduct the statute reaches. Additionally, Chief Justice Burger's position in Chiarella was espoused in a dissent and not the majority opinion.[13] Finally, the Santa Fe Court made clear that in construing § 10(b) resort could not be had to analogous federal statutes. See Santa Fe, 430 U.S. at 471-72 (court of appeals erred in relying on definition of fraud from other contexts in defining term in § 10(b) context); see also Carpenter, 484 U.S. at 24 (unanimously affirming defendant's mail fraud and wire fraud convictions based on same facts which divided the Court on § 10(b) conviction based on misappropriation theory).

Other courts that have recognized the misappropriation theory have either relied heavily on Newman or utilized interpretational methods which conflict with the Supreme Court's teachings on interpreting the scope of conduct encompassed by § 10(b). See Rothberg, 771 F.2d at 822 (relying solely on Newman); Cherif, 933

---

[13]As we noted above, the Chiarella Court declined to address whether a misappropriation theory was valid because such a basis was not submitted to the jury.

-17-

F.2d at 410 n.5 (relying on Newman and stating "[t]he more precise issues of statutory construction and legislative history have been treated exhaustively elsewhere, and we decline to revisit them."); Clark, 915 F.2d 443-453 (relying in part on Newman and also utilizing the meaning of fraud in other contexts). We note that neither Cherif nor Clark acknowledge Santa Fe in conducting their analysis. In essence, the courts which recognize the misappropriation theory seem to have validated it on the basis of the assumed unfairness of allowing an individual to trade securities on the basis of information which is not available to other traders. See United States v. Carpenter, 791 F.2d 1024, 1029 (2d Cir. 1986) (misappropriation theory permissible to give "legal effect to the commonsensical view that trading on the basis of improperly obtained information is fundamentally unfair. . . . ") (citation and quotations omitted), aff'd in part by evenly divided Court and rev'd in part, 484 U.S. 19, 24 (1987). However, the Supreme Court has repeatedly held that the mere possession of material nonpublic information does not automatically create a duty to disclose. See Chiarella, 445 U.S. at 232 ("not every instance of financial unfairness constitutes fraudulent activity under § 10(b)"); id. at 235 ("We hold that a duty to disclose under § 10(b) does not arise from the mere possession of nonpublic market information."); Dirks, 463 U.S. at 658 ("Imposing a duty to disclose or abstain solely because a person knowingly receives material nonpublic information from an insider and trades on it could have an inhibiting influence on the role of market analysts, which the SEC itself recognizes is necessary to the preservation of a healthy market."). The Bryan court undertook an exhaustive review of the opinions from these courts and concluded that these courts simply had given insufficient weight to the text of § 10(b) and improperly construed the Supreme Court's pronouncements on the reach of that provision. We agree fully with that observation and, therefore, we respectfully decline to follow the holdings of our sister circuits which have adopted the misappropriation theory.

As the Supreme Court has said, the securities industry generally, and § 10(b) specifically, is "`an area that demands certainty and predictability'" and "decisions `made on an ad hoc basis, offering little predictive value' to those who provide services to participants in the securities business'" are to be avoided. Central Bank, 114 S. Ct. at 1454 (quoting Pinter v. Dahl, 486 U.S. 622, 652 (1988)). The misappropriation theory undermines this interest by permitting liability to be imposed in a wide variety of circumstances involving a breach of fiduciary duty, presumably including a simple employee theft. See Bryan, 58 F.3d at 951-52 (outlining myriad of fiduciary situations in which the misappropriation theory has been applied). In essence, the theory creates "`a shifting and highly fact-oriented disposition of the issue of who may [be liable for] a damages claim for violation of Rule 10b-5.'" Central Bank, 114 S. Ct. at 1454 (quoting Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 755 (1975)). See also Blue Chip Stamps, 421 U.S. at 737 (Court described burgeoning of liability in § 10(b) area as "a judicial oak which has grown from little more than a legislative acorn."); United States v. Chestman, 947 F.2d 551, 564 (2d Cir. 1991) (en banc) (Winter, J., concurring in part and dissenting in part) (describing liability under § 10(b) for insider trading and stating that "caselaw establishes that some trading on material nonpublic information is illegal and some is not. The line between the two is less than clear."), cert. denied, 503 U.S. 1004 (1992).[14] In this light, we think the

---

[14]Perhaps the paradigmatic example of the attenuated circumstances in which a § 10(b) conviction based on the misappropriation theory has been obtained is United States v. Willis, 737 F. Supp. 269 (S.D.N.Y.), appeal dismissed, 778 F. Supp. 205 (S.D.N.Y. 1991). There, the government charged that the defendant, a psychiatrist, breached a physician-patient duty of confidentiality when he traded securities based on material, nonpublic information supplied by a patient that her husband was interested in becoming the CEO of BankAmerica. 737 F. Supp. at 270-72. In sustaining the defendant's conviction, the court held that under the misappropriation theory, § 10(b) liability was not limited only to situations in which the breach of the fiduciary relationship implicates the securities markets. 778 F. Supp. at 208-09.

misappropriation theory cannot be countenanced.[15]

Accordingly, we hold that the misappropriation theory is not a valid basis upon which to impose criminal liability under § 10(b).  Thus, because O'Hagan's convictions for securities fraud under § 10(b) and Rule 10b-5 in Counts 21-37 were premised solely on the misappropriation theory, these convictions must be vacated.

B.

O'Hagan also challenges his securities fraud convictions under § 14(e) of the Securities Exchange Act and Rule 14e-3.  Section 14(e) provides:

> It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they

---

[15]The misappropriation theory has also been criticized by commentators, primarily for the very reasons we reject the theory today.  See Michael P. Kenny & Teresa D. Thebaut, Misguided Statutory Construction to Cover the Corporate Universe: The Misappropriation Theory of Section 10(b), 59 Alb. L. Rev. 139 (1995); David C. Bayne, The Insider's Natural Law Duty: Chestman and the "Misappropriation Theory", 43 U. Kan. L. Rev. 79 (1994).  See also John R. Beeson, Comment, Rounding the Peg to Fit the Hole: A Proposed Regulatory Reform of the Misappropriation Theory, 144 U. Pa. L. Rev. 1077, 1138 (1996).  The Beeson article gives a perfect example of the ad-hoc basis on which the theory is employed, offering by way of example two individuals who obtain material, nonpublic information, on which they subsequently trade securities.  One can be prosecuted under § 10(b) while the other cannot, based simply on the fact that the individual who may be prosecuted traded on the information in violation of a breach of a fiduciary duty while the other individual received the information fortuitously.  See Beeson, 144 U. Pa. L. Rev. at 1078-79.  These two individuals call to mind the Supreme Court's statement in Chiarella that "a duty to disclose under § 10(b) does not arise from the mere possession of nonpublic market information."  445 U.S. at 235.

are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer . . . . The [SEC] shall, for the purposes of this subsection, by rules and regulations define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative.

15 U.S.C. § 78n(e). The first sentence in § 14(e) was enacted in 1968 as part of the Williams Act. Chestman, 947 F.2d at 564. "`The purpose of the Williams Act is to insure that public shareholders who are confronted by a cash tender offer for their stock will not be required to respond without adequate information.'" Schreiber v. Burlington Northern, Inc., 472 U.S. 1, 8 (1985) (quoting Rondeau v. Mosinee Paper Corp., 422 U.S. 49, 58 (1975)). See also Piper v. Chris-Craft Indus., 430 U.S. 1, 35 (1977) ("The legislative history thus shows that the sole purpose of the Williams Act was the protection of investors who are confronted with a tender offer."). Thus, the focus of § 14(e) is on the shareholders of the company who are or will be confronted with a tender offer. The purpose of § 14(e) is to "add[] a broad antifraud prohibition modeled on the antifraud provisions of § 10(b) of [the Securities Exchange Act of 1934] and Rule 10b-5 . . . ." Schreiber, 472 U.S. at 10 (inner quotations and citations omitted).

The second sentence of § 14(e) is a rulemaking provision that was enacted in 1970, two years after the original Williams act. Chestman, 947 F.2d at 564. Accordingly, the SEC promulgated Rule 14e-3(a) in 1980, which provides:

> (a) If any person has taken a substantial step or steps to commence, or has commenced, a tender offer (the "offering person"), it shall constitute a fraudulent, deceptive, or manipulative act or practice within the meaning of section 14(e) of the [Securities Exchange] Act for any other person who is in possession of material information relating to such tender offer which information he knows or has reason to know is nonpublic

and which he knows or has reason to know has been acquired directly or indirectly from:

> (1) The offering person,
> (2) The issuer of the securities sought or to be sought by such tender offer, or
>
> (3) Any officer, director, partner, or employee or any other person acting on behalf of the offering person or such issuer,

to purchase or sell or cause to be purchased or sold any of such securities or any securities convertible into or exchangeable for any such securities or any option or right to obtain or to dispose of any of the foregoing securities, unless within a reasonable time prior to any purchase or sale such information and its sources are publicly disclosed by press release or otherwise.

17 C.F.R. § 240.14e-3(a).

"Rule 14e-3(a) is a disclosure provision." Chestman, 947 F.2d at 557. An individual violates the rule when "he trades on the basis of material nonpublic information concerning a pending tender offer that he knows or has reason to know has been acquired `directly or indirectly' from an insider of the offeror or issuer, or someone working on their behalf." Id. (quoting Rule 14e-3(a)). Thus, the rule creates a duty to disclose this information, or to abstain from trading, "regardless of whether such information was obtained through a breach of fiduciary duty." SEC v. Maio, 51 F.3d 623, 631 (7th Cir. 1995); see also SEC v. Peters, 978 F.2d 1162, 1166-67 (10th Cir. 1992) (holding breach of fiduciary relationship not required to establish violation of Rule 14e-3); Chestman, 947 F.2d at 557 (Rule 14e-3(a) "creates a duty in those traders who fall within its ambit to abstain or disclose, without regard to whether the trader owes a pre-existing fiduciary duty to respect the confidentiality of the information.").

O'Hagan contends that his securities fraud convictions under § 14(e) and Rule 14e-3(a) must be vacated because the SEC exceeded

its rulemaking authority when it promulgated Rule 14e-3(a). Specifically, O'Hagan claims that the SEC impermissibly redefined fraud in Rule 14e-3(a) by omitting the requirement that a breach of a fiduciary duty must be shown because the term fraud under § 14(e) requires a breach of fiduciary duty.

An administrative rule exceeds its statutory mandate if it is "inconsistent with the statutory mandate or . . . frustrate[s] the policy that Congress sought to implement." Securities Indus. A'ssn v. Board of Governors, 468 U.S. 137, 143 (1984) (inner quotations and citation omitted). To date, three courts have considered whether the SEC exceeded its rulemaking authority when it promulgated Rule 14e-3 without the requirement of a breach of a fiduciary duty. See Maio, 51 F.3d at 634-35; Peters, 978 F.2d at 1165-67; Chestman, 947 F.2d at 556-63. These courts have all concluded that the SEC did not exceed its authority. After carefully reviewing these decisions and considering them in light of the text of § 14(e) and the Supreme Court's holdings in Chiarella and Schreiber, we conclude that we must depart from the holdings of our sister circuits and hold that the SEC exceeded its rulemaking authority by enacting Rule 14e-3(a) without including the requirement of a breach of a fiduciary duty.

Because this issue turns on the scope of conduct that may be regulated by § 14(e), once again the plain language of the statute is controlling. See Central Bank, 114 S. Ct. at 1446-48 (with respect to determining the scope of conduct prohibited by § 10(b), "the text of the statute controls our decision"). Although the Central Bank Court dealt with scope of conduct prohibited by § 10(b), the Court stated unequivocally that its textual analysis applied to all provisions in the Securities Act. See id. at 1447 ("Adherence to the text in defining the conduct covered by § 10(b) is consistent with our decisions interpreting other provisions of the securities Acts."). This methodology is in line with that

employed by the Schreiber Court where, in the context of interpreting the term "manipulative" under § 14(e), the Court turned to the language of the statute.  See 472 U.S. at 6 ("[t]he starting point is the language of the statute.").

We thus turn our attention to the text of § 14(e).  Specifically, we focus on the second sentence of that provision, the enabling provision. It provides in pertinent part:  "The Commission shall, for the purposes of this subsection, by rules and regulations define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent . . . ."  Eliminating those words having no bearing to our inquiry, the statute empowers the SEC to "define" and "prescribe means reasonably designed to prevent" "acts and practices" which are "fraudulent."  Thus, by dissecting the language and structure of the statute, it becomes clear that the terms "define" and "prescribe" relate to "acts and practices" meeting the statutory definition of "fraudulent."

A straightforward exercise in statutory construction then affords no basis for concluding that § 14(e) authorizes the SEC to create its own definition of fraud in implementing the statute.  Simply put, the enabling provision of § 14(e) permits the SEC to identify and regulate those "acts and practices" which fall within the § 14(e) legal definition of "fraudulent," but it does not grant the SEC a license to redefine the term. See Chestman, 947 F.2d at 584 (Mahoney, J., concurring in part and dissenting in part) ("the plain meaning of the dispositive language is that the SEC is empowered to identify and regulate, in this (then) novel [tender offer] context, the `acts and practices' that fit within the existing legal categories of the `fraudulent, deceptive, or manipulative,' but not to redefine the categories themselves.").

The government takes issue with this reading of § 14(e), claiming that the plain language is a broad delegation to the SEC of rulemaking powers and, when properly read, it empowers the SEC to "define" and "prescribe means reasonably designed to prevent" "fraudulent conduct" in the tender offer context. In essence, the government conflates the language of the statute into a broad empowerment to the SEC to "define" and "prescribe" "fraud." As we point out above, however, this is not what the plain language of § 14(e) delegates to the SEC; the enabling provisions simply permit the SEC to "define" and "prescribe" "acts and practices" which meet § 14(e)'s meaning of "fraudulent."

We thus must ascertain the meaning of "fraudulent" in § 14(e). The Congress gave no indication that the term was to have a meaning different from its common legal definition. See id. ("Furthermore, these venerable terms are used in their normal, accepted definitions."). The Schreiber Court looked to the common law and dictionary definitions in defining manipulation. See Schreiber, 472 U.S. at 7 (court construed "manipulative" in manner consistent with its common law and dictionary definition). Black's Law Dictionary provides certain definitions of "fraud" which are entirely consistent with the breach of a fiduciary duty, while other definitions would impose no such requirement. Compare Black's Law Dictionary 660 (6th ed. 1990) ("concealment of that which should have been disclosed," and "acts, omission, and concealments involving a breach of a legal or equitable duty") with id. ("An intentional perversion of truth for the purpose of inducing another in reliance upon it," "A false representation of a matter of fact," and "A generic term, embracing all multifarious means which human ingenuity can devise"). Thus, the dictionary definitions provide little assistance in resolving this problem. However, the analytic model created by the Supreme Court's holdings in Schreiber and Chiarella, cases drawing heavily on common law

-25-

principles, leads to the inescapable conclusion that fraudulent under § 14(e) must be read to include a breach of a fiduciary duty.

In <u>Schreiber</u>, the Court explicitly held that § 14(e) is modeled after the broad antifraud provisions of § 10(b) and Rule 10b-5.  472 U.S. 10 & n.10.  Moreover, in the course of interpreting manipulation, the Court turned to the meaning that term had been given under § 10(b), noting that "Congress used the phrase `manipulative or deceptive' in § 10(b) as well, and we have interpreted `manipulative' in that context to require misrepresentation."  <u>Id.</u> at 7-8 & n.6.  The Court went on to note that "[a]ll three species of misconduct, i.e., `fraudulent, deceptive, or manipulative,' listed by Congress are directed at failures to disclose." <u>Id.</u> at 8.  Accordingly, the definition that fraudulent has been given under § 10(b) and Rule 10b-5 guides our interpretation of the term under § 14(e).

As we observed during our discussion of § 10(b), the <u>Chiarella</u> Court drew upon common law concepts in defining fraud under § 10(b), holding that the term encompassed a failure to disclose information but only if there was a duty to speak.  445 U.S. at 222, 235.  This duty to speak, in turn, arises out of a "`fiduciary or other similar relation of trust and confidence.'"  <u>Id.</u> at 228 (quoting Restatement (Second) of Torts § 551(2)(a) (1976)).

Reading <u>Schreiber</u> and <u>Chiarella</u> together leads to the conclusion that "fraudulent" under § 14(e) includes the breach of a fiduciary obligation. Initially, we note that § 10(b) and § 14(e) are contained in the same statutory enactment, the Securities Exchange Act of 1934 -- strong evidence that the terms are to be given the same meaning.  See <u>Gustafson v. Alloyd Co., Inc.</u>, 115 S. Ct. 1061, 1067 (1995) (term "prospectus" construed to have the same meaning in § 10 of the 1933 Securities Act as in § 12 of that same Act); <u>see also</u> <u>id.</u> (in holding that "identical words

used in different part of the same act are intended to have same meaning," Court stated "[t]he Securities Act of 1933, like every Act of Congress, should not be read as a series of unrelated provisions."). That § 10(b) does not specifically include the term fraud is of no moment because it is beyond cavil that that provision is a powerful antifraud provision. Chiarella, 445 U.S. at 234-35. Further, the Schreiber Court turned directly to § 10(b) to define terms in § 14(e), and Chiarella held that fraudulent under § 10(b) requires the breach of a fiduciary obligation. Of added import, the Schreiber Court held that "fraudulent" under § 14(e) was directed at nondisclosure of information, while the Chiarella Court detailed the circumstances under which nondisclosure is fraudulent under § 10(b). Additionally, we also think it significant that the Chiarella Court turned to common law concepts in giving meaning to fraudulent under § 10(b), as did the Schreiber Court in interpreting manipulative under § 14(e).

Finally, we also find telling that, in the quote from Chiarella in the above paragraph, the Supreme Court quoted the Restatement (Second) of Torts and then stated that the American Law Institute views this rule as applicable to "securities transactions." See Chiarella, 445 U.S. at 228 n.9 ("As regards securities transactions, the American Law Institute recognizes that `silence when there is a duty to . . . speak may be a fraudulent act.'" (quoting ALI, Securities Code § 262(b) (Prop. Off. Draft 1978)). It is inexplicable to us why this Restatement rule, should have definitive force in the § 10(b) context but not in the § 14(e) context, especially in light of the fact that the two sections are part of the same statutory scheme. See Chestman, 947 F.2d at 586-87 (Mahoney, J., concurring in part and dissenting in part). Accordingly, we hold that Schreiber and Chiarella mandate that

"fraudulent" under § 14(e) must be interpreted to require the breach of a fiduciary obligation or similar trust relationship.[16]

The government does not explicitly address the force of Chiarella and Schreiber on this issue, instead arguing that if the authority granted to the SEC to define fraud is circumscribed to simply applying the meaning that term is given in the § 10(b) context, the SEC really has no authority at all under the statute. We disagree. As we noted above, the SEC does not have the authority to define fraud; rather, the plain language of § 14(e) permits the SEC to define and prescribe preventive measures for acts and practices which are fraudulent. Moreover, this grant of authority to the SEC, even without the power to define fraud, remains a very powerful tool because the SEC has broad latitude in regulating acts and practices in the wide ranging and diverse field of tender offers. Finally, and most importantly, we think Schreiber is a strong rebuttal to this argument because there the Court looked directly at § 10(b) to define manipulative under § 14(e). 472 U.S. at 7-8.

The government also points out that the language in § 14(e), granting the SEC rulemaking authority, is different from that in § 10(b), arguing that the § 14(e) language grants the SEC much broader rulemaking powers than under § 10(b). We believe, however, the government makes too much of what in reality are simply minor discrepancies in language between the two provisions. Section

---

[16]Additionally, some commentators have indicated that the rationale from Bryan, 58 F.3d at 943-59, with respect to the misappropriation theory under § 10(b), also calls into doubt the validity of Rule 14e-3(a). Richard M. Phillips & Gilbert C. Miller, Litigation Reform in the Courts: Limiting Section 12(2) Liability, The Bespeaks Caution Doctrine and the Misappropriation Theory, CA28 ALI-ABA 487, 527 (February 16, 1996) ("Indeed, under the [Bryan) court's rationale, it is by no means clear that SEC Rule 14-3 would be upheld to preclude transactions in the securities of target companies by insiders of tender offerors.").

10(b) permits the Commission to create "rules and regulations" which are "necessary or appropriate in the public interest or for the protection of investors," while § 14(e) empowers the Commission to enact "rules and regulations" which "define" and "prescribe means reasonably designed to prevent" "acts and practices" which are "fraudulent."  In the end, although perhaps § 14(e) is the product of clearer legislative draftsmanship, the authority granted to the SEC under both provisions is fundamentally the same.  See Chestman, 947 F.2d at 587 (Mahoney, J., concurring in part and dissenting in part) (positing that minor discrepancies in statutory language of § 10(b) and § 14(e) are of no significance).[17]

Finally, the government contends that the meaning of "fraudulent" under § 14(e) is irrelevant in deciding this issue because of the statutory language authorizing the SEC "to prescribe means reasonably designed to prevent" the acts and practices which are fraudulent.  The government argues that under this language, the SEC may regulate conduct which is not fraudulent in order to prevent the commission of a fraudulent act.  The government points to a passage from a footnote in Schreiber, where the Court stated that the enabling provision in § 14(e) empowered the SEC to "regulate nondeceptive activities as a `reasonably designed' means of preventing manipulative acts . . . ."  472 U.S. at 11 n.11.

---

[17]We also note that to the extent that the Chestman majority relied on the statements of a subsequent Congress in interpreting § 14(e), such a method of interpretation was condemned by the Supreme Court in Central Bank.  There, the court made clear that using statements of a later Congress to interpret a statute enacted by an earlier Congress is to be avoided, at least in the area of securities law.  See Central Bank, 114 S. Ct. at 1452 ("[T]he interpretation given by one Congress (or committee or Member thereof) to an earlier statute is of little assistance in discerning the meaning of that statute.").  As the government correctly observes, however, the Chestman majority first relied on the text of the statute to reach its conclusion, and thus it is unclear how much weight the majority gave to this evidence. See Chestman, 947 F.2d at 558.

However, the government fails to include the remainder of this sentence from Schreiber, which states, "without suggesting any change in the meaning of the term `manipulative' itself." Id. Properly read, this provision means simply that the SEC has broad regulatory powers in the field of tender offers, but the statutory terms have a fixed meaning which the SEC cannot alter by way of an administrative rule.

We take pause to observe, as the government points out, that "[b]ecause Congress has expressly granted the SEC authority to promulgate rules which will implement section 14(e), rules promulgated under that section have `legislative effect' and are `entitled to more than mere deference. . . .'" (Gov't's Br. at 53 (quoting Batterton v. United States, 432 U.S. 416, 425-26 (1977).) Thus, the government continues, we may not set aside these rules simply because we would have interpreted § 14(e) in a manner different from the SEC, but only if the rule is inconsistent with the statutory mandate or frustrates the Congressional policy sought to be implemented.

While the government's point is well made, nonetheless, an administrative agency's interpretation of a statute under which it has been given rulemaking authority is not wholly beyond reproach. In this vein, the Supreme Court observed in IBT v. Daniel, 439 U.S. 551, 566 n.20 (1979), that "[T]his deference is constrained by our obligation to honor the clear meaning of a statute, as revealed by its language, purpose, and history. On a number of occasions in recent years this Court has found it necessary to reject the SEC's interpretation of various provisions of the Securities Acts." See also Aaron v. SEC, 446 U.S. 680, 694 n.11 (1980) (rejecting SEC's view that scienter is not required in § 10(b) injunctive proceedings); Business Roundtable v. SEC, 905 F.2d 406, 407 (D.C. Cir. 1990) (holding that SEC exceeded its statutory authority in promulgating Rule 19c-4 to bar national securities exchange and

associations from listing stocks violative of one share/one vote principle). We conclude that, in this instance, the SEC has once again acted in excess of its statutory authority.

We hold that the SEC exceeded its rulemaking authority under § 14(e) when it promulgated Rule 14e-3(a) without including a requirement of a breach of a fiduciary obligation. Accordingly, we must vacate O'Hagan's securities fraud convictions under these provisions.

C.

O'Hagan was also convicted on a number of counts of mail fraud and money laundering. The essential elements of the crime of mail fraud are: (1) a scheme to defraud, or to obtain money or property by false pretenses, and (2) use of the mails to further the scheme. United States v. Wicker, 80 F.3d 263, 267 (8th Cir. 1996). The mere fact that O'Hagan's securities convictions have been reversed does not as a matter of law require that the mail fraud convictions likewise be reversed. See Carpenter, 484 U.S. at 24 (unanimously affirming mail and wire fraud convictions based on the same facts that evenly divided the Court on the defendant's securities fraud convictions); Bryan, 58 F.3d at 936 (affirming mail fraud and wire fraud counts but reversing on securities fraud counts). However, in the present case, the indictment was structured in such a manner as to premise the fraud for the mail fraud charges on the acts allegedly constituting the securities fraud. (See R. at 697-706.) Because O'Hagan's conduct did not constitute securities fraud for the reasons we have noted above, there was no fraud upon which to base the mail fraud charges. Accordingly, we reverse O'Hagan's mail fraud convictions.

With regard to the money laundering counts, they were predicated on the securities fraud or mail fraud counts. Because

we have vacated all of the securities fraud and mail fraud counts, there no longer remain any convictions to serve as the predicate conduct upon which to base the money laundering counts.  We therefore must reverse these convictions as well.  See 18 U.S.C. §§ 1956-1957 (requiring the property involved in the transaction to be derived from or the proceeds of unlawful activities).

### III.

Our ruling today should in no manner be understood as condoning O'Hagan's conduct.  From the record, it appears as though O'Hagan, then an attorney at law,  engaged in at least some transactions in Pillsbury securities after learning privileged, confidential information that his law firm was representing a client intending a takeover of Pillsbury.  Such conduct is certainly unethical and immoral and must be condemned, which we make haste to do.  We note that O'Hagan was disbarred in Minnesota, and served a 30-month sentence after being convicted in Minnesota state court for invading clients' trust funds.  However, it is a fundamental principle of the criminal law that not every ethical or moral transgression falls within its realm.  This case is a prime example of that principle. Accordingly, for the reasons enumerated above, we reverse O'Hagan's securities fraud, mail fraud, and money laundering convictions and remand this case to the district court for dismissal of the indictment.

FAGG, Circuit Judge, dissenting.

My colleagues have carefully analyzed both sides of the relevant legal coins and selected the sides that nullify O'Hagan's convictions. Contrary to their well-reasoned views, I would recognize and adopt the misappropriation theory like the Second, Seventh, Ninth, and Third Circuits, see ante at 16 & nn. 9-12, and thus uphold O'Hagan's convictions for securities fraud under

§ 10(b) and Rule 10b-5.  <u>United States v. Libera</u>, 989 F.2d 596, 599-600 (2d Cir.), <u>cert. denied sub nom.</u> <u>Sablone v. United States</u>, 114 S. Ct. 467 (1993); <u>SEC v. Maio</u>, 51 F.3d 623, 631 (7th Cir. 1995); <u>SEC v. Clark</u>, 915 F.2d 439, 453 (9th Cir. 1990); <u>Rothberg v. Rosenbloom</u>, 771 F.2d 818, 822 (3d Cir. 1985), <u>rev'd after remand</u>, 808 F.2d 252 (1986), <u>cert. denied</u>, 481 U.S. 1017 (1987).  Also, like the Second, Seventh, and Tenth Circuits, <u>see</u> <u>ante</u> at 22-23, I would hold the Securities Exchange Commission did not exceed its rulemaking authority when it enacted Rule 14e-3(a) without the requirement of a breach of a fiduciary duty, and thus uphold O'Hagan's securities fraud convictions under § 14(e) and Rule 14e-3(a).  <u>United States v. Chestman</u>, 947 F.2d 551, 556-63 (2d Cir. 1991) (en banc), <u>cert. denied</u>, 503 U.S. 1004 (1992); <u>Maio</u>, 51 F.3d at 634-35; <u>SEC v. Peters</u>, 978 F.2d 1162, 1165-67 (10th Cir. 1992).  Having adopted these views, I find no basis to reverse O'Hagan's convictions for mail fraud and money laundering.  <u>See</u> <u>ante</u> at 31-32.  Because I would affirm all of O'Hagan's convictions, I would also consider the merits of the government's appeal from O'Hagan's sentences.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.